**Amy Frances ELLIS, Zella Fern Frazier and Victor Frazier, Plaintiffs-Appellants,**

v.

**Francis N. HAMILTON, et al., Defendants-Appellees.**

No. 81–1079.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1982.

Decided Feb. 1, 1982.

Rehearing and Rehearing En Banc Denied March 31, 1982.

Ralph Ogden, Wilcox, Ogden & Dumond, Indianapolis, Ind., for plaintiffs-appellants.

J. D. Calbert, Calbert & Bremer, Greencastle, Ind., for defendants-appellees.

Before WOOD and POSNER, Circuit Judges, and WILL,* Senior District Judge.

POSNER, Circuit Judge.

This is a suit under 42 U.S.C. § 1983 for injunctive relief and damages against several welfare and judicial officers (including a judge) in Putnam County, Indiana. The plaintiffs claim that their rights under the due process clause of the Fourteenth Amendment were violated by these officers in connection with proceedings that led to the plaintiffs' grandchildren (as we shall call them without meaning thereby to prejudge their status, which is contested) being removed from the plaintiffs' homes and adopted by strangers. The district court granted summary judgment for the defendants.

The plaintiffs are Amy Ellis, her sister Zella Frazier, and Zella's husband Cyril Frazier. Mrs. Frazier is the natural mother, and Amy Ellis the aunt, of Larry Ellis. In 1952 Mrs. Ellis adopted Larry with the consent of Mrs. Frazier. The adoption extinguished Mrs. Frazier's parental rights and vested them in her sister. Mr. Frazier is not Larry's father or otherwise related to him. He married Zella long after she had given up Larry for adoption.

Larry grew up and got married. Between 1969 and 1974 four children were born to the marriage. Larry and his wife were unsatisfactory parents, however, and the children lived for long stretches of time with Mrs. Ellis and Mrs. Frazier. In 1975 Mrs. Ellis complained to the defendants that Larry and his wife were mistreating the children. Her complaint led to criminal charges being lodged against Larry and his wife for cruelty and neglect. An order was entered removing the children from their parents' custody and placing them in a foster home, but the parents later regained custody, and were living with the children

in Mrs. Ellis' home when, in July 1977, the mother decamped. Larry thereupon told the defendants that he wanted two of the children to remain with Mrs. Ellis and the other two to live with Mrs. Frazier. Larry took the two children to Mrs. Frazier's house and then disappeared.

The facts narrated up to this point are undisputed, but now the plaintiffs' and the defendants' versions begin to diverge. Since the complaint was dismissed on summary judgment, we must accept the plaintiffs' version of the facts to the extent that they are supported by the affidavits submitted to the district court.

The plaintiffs say that the defendants initially acquiesced in Larry's proposal to place the children in the homes of Mrs. Ellis and Mrs. Frazier, and that the plaintiffs thereby acquired legal custody of the children. One month later the defendant welfare officers ordered the plaintiffs, on two days' notice and without any explanation, to surrender the children to them. They placed the children in a totally unsuitable—in fact, notorious—group foster home where the female children were subjected to sexual abuse. When the plaintiffs complained, the welfare officers took the children out of the group home and placed them with foster parents but refused to tell the plaintiffs who the foster parents were or where they lived. The children were heartbroken at the separation from their grandparents and would have preferred to live with them.

The plaintiffs eventually retained a lawyer, who in May of the following year inquired of the defendant welfare officers about the children. The welfare officers, fearing that the lawyer would begin proceedings for the adoption of the children by Mrs. Ellis and Mrs. Frazier, filed in June a petition with the defendant judge to terminate the parental rights of Larry Ellis and his wife. Because their whereabouts were unknown, notice of the proceeding was by publication in the local newspaper. No ef-

* Of the Northern District of Illinois.

fort was made to notify the plaintiffs specifically, but their lawyer knew about the proceeding. A hearing was held on June 25, 1978, and the judge ordered the parental rights of Larry and his wife terminated. Neither the plaintiffs' lawyer nor any of the plaintiffs was at the hearing.

The termination cleared the way for the children to be adopted, and the plaintiffs set about trying to adopt them. But their lawyer was given the runaround by the defendant court officers, who offered niggling and specious objections to the formal adequacy of the petition for adoption. As a result she was forced to file a second, and on August 24 a third, petition. A few days later the defendants informed her that the children had already been adopted by others. The adoptions (each child was adopted by a different couple) had taken place after the plaintiffs' lawyer filed the first petition, and neither she nor the plaintiffs had actual or constructive notice of the adoption proceedings. The adoptions robbed the plaintiffs not only of their hopes of adopting the children themselves but also, it seemed, of any right ever to see them again, for the defendants told the plaintiffs that it would be up to the adoptive parents to decide whether to permit the plaintiffs to visit with the children.

This suit was brought three months after the plaintiffs discovered the adoptions, and originally sought to nullify them; but after the suit had been pending for two years the plaintiffs decided that it would do more harm than good to the children to separate them from their new parents. All that the plaintiffs are now seeking in this action is a decree granting them visitation rights and damages for the deprivation of the custody and companionship of the children that they would have enjoyed but for the actions of the defendants. The plaintiffs have not been permitted to visit the children since they were removed from the group home.

We have no doubt that if welfare caseworkers, acting so precipitately as to prevent any recourse to the protective legal machinery of the state, barged into a couple's home, seized their children, seques-tered them in a secret place, and put them up for adoption without notifying the parents, they would be guilty of violating 42 U.S.C. § 1983, no matter how regular the adoption proceeding on its face. We do not think any exotic constitutional doctrine— not even the ubiquitous oxymoron "substantive due process"—would be necessary in order to reach that result. It is plain to us that the "liberty" protected by the due process clause of the Fourteenth Amendment includes the right to the custody of one's minor children and that it would be a deprivation of that liberty without due process of law for persons acting under color of state law permanently to separate the children from their parents without notice and hearing. We have to decide how close this case is to that one.

The plaintiffs are of course not the parents of Larry Ellis' children; we are not sure quite what to call them. Cyril Frazier's relationship to the children is particularly tenuous. Having married their grandmother after she had given up Larry for adoption, Cyril is neither a natural nor an adoptive grandfather of Larry's children nor even, if there is such a thing, a "stepgrandfather." Mrs. Frazier is the children's natural grandmother but she voluntarily relinquished any prospective legal rights in Larry's children when she put him up for adoption. The interest of a natural grandmother in grandchildren born long after their parent was adopted away seems too tenuous to be part of the liberty protected by the due process clause.

Mrs. Ellis' claim to have a constitutionally protected liberty interest is the strongest, but we are not sure that even it should be accepted. There is first the question whether adoptive and natural grandparents should be equated. Cases such as *Stanley v. Illinois*, 405 U.S. 645, 657–58, 92 S.Ct. 1208, 1215–1216, 31 L.Ed.2d 551 (1972), where the Supreme Court held that a father has a liberty interest in the custody of his illegitimate child, point to a biological rather than jural concept of the family, while *Smith v. Organization of Foster Families*, 431 U.S. 816, 843–44 n.49, 97 S.Ct.

2094, 2109, 53 L.Ed.2d 14 (1977), en route to holding that foster parents have at least an arguable liberty interest, contains language that points the other way. In the hypothetical case with which we began, it would probably make no difference whether the parents were natural or adoptive. Adoptive parents have all the legal rights, and generally the same emotional stake, in their children as natural parents. We are less sure it should make no difference in a case involving grandparents.

Passing this objection to Mrs. Ellis' claim, we reach the more fundamental question whether even a natural grandparent's interest in the society of her grandchildren, though an interest rooted in powerful emotions, is a liberty interest under the due process clause. If the grandchildren are in their parents' custody, the answer probably is no. In such a case the grandparents could not maintain an action in tort for the injury or death of any of the grandchildren under Indiana law, see Ind.Code § 34–1–1–8, or so far as we know that of any other state, see, e.g., *Solomon v. Harman*, 107 Ariz. 426, 489 P.2d 236 (1971). It would be odd if the threshold for triggering a federal tort action under section 1983 were lower.

A more difficult question is presented where, as here, the grandchildren are not in the parents' custody. *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), heavily relied on by the plaintiffs, is surely relevant, but it does not control this case even if we treat the plurality opinion as stating the view of the whole Court. That case involved the constitutionality of a zoning ordinance that prevented a grandmother from living with her grandson. In striking down the ordinance the Court was concerned with the impact on the family unit as a whole—that is, with the interests of the child as well as of the grandparent. See *id.* at 504–06, 97 S.Ct. at 1938–1939. Although the plaintiffs here believe that the children would have been happier in their custody, the emphasis of the lawsuit is on their loss, their anguish, rather than the children's.

*Drollinger v. Milligan*, 552 F.2d 1220, 1226–27 (7th Cir. 1977), in this circuit, was a case where a grandfather offered to provide a home to his daughter, who was on probation, and her daughter (his granddaughter). This court held that grandparents have rights enforceable in section 1983 actions. But *Drollinger* is not necessarily the last word on the question even in this circuit. The opinion devotes only a footnote to the question whether grandparents have rights protected by the due process clause (*id.* at 1227 n.6), and addresses *adoptive* grandparents' rights not at all.

■ Despite the absence of compelling authority for holding that grandparents, whether natural or adoptive, ever have a liberty interest under the due process clause, we draw back from concluding that they never do. Like the grandmother in the *Moore* case, Mrs. Ellis during much of the lives of these unfortunate children took the place of totally inadequate parents. We do not want to romanticize her role unduly. Our narration of the facts was, as we said, based on the plaintiffs' own evidence, which naturally paints Mrs. Ellis in a rosy hue and was contested. The defendants have known the entire family intimately for many years and may have had excellent reasons for wanting to keep the children out of Mrs. Ellis' hands (such as her age—she was 69 in 1978). But on this appeal we must disregard that possibility and accept as true that Mrs. Ellis was *in loco parentis* to these children when the defendants took them away from her; and we are reluctant to conclude that a great-aunt, an adoptive grandmother, and a *de facto* mother and father all rolled up into one does not have a liberty interest sufficiently like that of a parent to support an action under section 1983. *Prince v. Massachusetts*, 321 U.S. 158, 159, 166, 64 S.Ct. 438, 439, 442, 88 L.Ed. 645 (1944), after all, equated an "aunt and custodian" to a parent, though without discussion and very possibly inadvertently. Mrs. Ellis was a great-aunt who claims to have had formal custody of the children when the defendants took them from her home in July 1977. Although it seems clear that the interest *prospective* adoptive parents have in the children they

are seeking to adopt is not a liberty interest, and the plaintiffs here were that, they were also more; as custodians, they might well have had a right of action if the children had been tortiously injured or killed while living with them in July 1977, see Ind.Code § 34–1–1–8; Love, *Tortious Interference with the Parent-Child Relationship*, 51 Ind.L.J. 590, 621–22 (1976); cf. *Villafane v. Banner*, 87 Misc.2d 1037, 387 N.Y.S.2d 183 (Sup.Ct. N.Y. County 1976), though noncustodial grandparents, as we noted earlier, would not have such a right.

Assuming that Mrs. Ellis (and perhaps, though this is more doubtful, the Fraziers as well) had a liberty interest in the society of her grandchildren, we must consider whether, if the facts are viewed in the light most favorable to her, the defendants deprived her of that interest without due process of law. The plaintiffs do not challenge the formal adequacy of Indiana's adoption law (Ind.Code §§ 31–3–1–1 *et seq.*) because it does not entitle grandparents to notice of a proceeding to terminate parental rights over or to adopt their grandchildren or because it does not allow grandparents to intervene in an adoption proceeding. See *Krieg v. Glassburn*, 419 N.E.2d 1015, 1020 (Ind.App.1981). These are typical features of adoption law. See, e.g., *Barriner v. Stedman*, 580 P.2d 514, 517–18 (Okl.1978); but cf. *Wilson v. Family Services Division*, 554 P.2d 227 (Utah 1976) (giving grandparents a right to be heard in an adoption proceeding). Rather, the plaintiffs' complaint is that the defendants unreasonably deprived them of the society of the children in 1977 after Larry Ellis gave them up, and then stymied their efforts to obtain custody of the children by adoption.

We shall grant the plaintiffs—though only for the sake of argument, since the facts have not been determined—that the defendants' conduct was captious, pettifogging, and underhanded throughout. We shall grant them also that their failure to appear at the termination hearing is irrelevant even though they had notice of it, because the judge was determined to deprive them of the custody of the children regardless of anything they or their lawyer said at the hearing. We agree with them that the defendants insult the syllogism by arguing that the termination of Larry's parental rights automatically severed any right that Mrs. Ellis might have had over the children, because that right ran to her through Larry. The argument makes her earlier and wholly praiseworthy act of reporting Larry's mistreatment of the children to the defendants the fulcrum on which she is levered out of court. We shall also grant the plaintiffs that the defendants committed many errors of Indiana law in processing the plaintiffs' adoption petition.

■ But with all this conceded to the plaintiffs a denial of due process of law has not been established. If due process were denied every time local officials blundered, then any plaintiff in state court who was asserting a right within the broadly defined categories of liberty or property and who lost his case because the judge made an error could attack the judgment indirectly by suing the judge under section 1983. That would be an intolerable interference with the orderly operations of the state courts. Due process is denied in such a case only if the state fails to provide adequate machinery for the correction of the inevitable errors that occur in legal proceedings—unless the defendants act with such ruthless speed that the machinery of correction cannot be brought into play in time.

Therefore, if by design or in effect Indiana law placed the plaintiffs completely at the mercy of county welfare and judicial officers who misbehaved as alleged in the complaint, these allegations would raise a serious due process question. But instead the law of Indiana provides a variety of remedies by which to correct, and promptly, this kind of misbehavior. The remedies available to these plaintiffs included habeas corpus when the welfare officers removed the children from Mrs. Ellis' home, see, e.g., *Risner v. Risner*, 243 Ind. 581, 189 N.E.2d 105 (1963); mandamus when the judge refused to allow them to file their own adoption petition, see Ind.Code § 34–4–18–2; cf. *State ex rel. Palmer v. Circuit Court*

*of Hendricks County*, 244 Ind. 297, 192 N.E.2d 625 (1963); an action based on fraud to enjoin the adoption away from the plaintiffs, see, e.g., *Caley v. Lung*, 257 Ind. 116, 271 N.E.2d 891 (1971); and a petition for visitation rights, see *Krieg v. Glassburn, supra*, 419 N.E.2d at 1019 (expressly permitting grandparents to petition for visitation rights). The plaintiffs could also have refused to surrender the children when the defendants directed them to do so. This would have forced the defendants to use legal process, which the plaintiffs could have resisted in the Indiana courts. They did none of these things but instead brought this federal suit and by doing so made it impossible for the courts of Indiana to prevent the defendants' alleged misconduct.

We do not say that a section 1983 plaintiff must exhaust his state remedies before he can proceed in federal court. That would imply that if the plaintiffs here had assiduously but unsuccessfully pursued their remedies under Indiana law we could not reject their federal claims without a trial. The point, rather, is that there is no denial of due process if the state provides reasonable remedies for preventing families from being arbitrarily broken up by local domestic relations officers such as the defendants in this case. The courts of Indiana seem every bit as determined to prevent such wrongs as the federal courts would be. See *Matter of Adoption of Hewitt*, 396 N.E.2d 938 (Ind.App.1979); *Matter of Joseph*, 416 N.E.2d 857 (Ind.App.1981). Indeed, despite their dilatoriness, the plaintiffs in the present case still have remedies they can pursue under Indiana law. A motion by the plaintiffs to supplement the record on appeal advises us that in November of last year the Putnam County welfare board filed a petition in the county court charging the adoptive parents of one of the plaintiffs' grandchildren with abuse and neglect of the child. The Fraziers have moved to intervene in the case and their motion is pending before that court. They have also moved the court, successfully, to order the child examined by a competent psychiatrist. These developments deepen our sympathy for this unfortunate family and bolster the plaintiffs' contention that the defendants have mishandled the whole business. But they also show that the plaintiffs really did, and still do, have remedies under Indiana law.

The approach we take here, which considers the adequacy and availability (not exhaustion) of remedies under state law before concluding that a deprivation of life, liberty, or property violates due process of law, is not a novelty in either property cases, see *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), or liberty cases, see *Ingraham v. Wright*, 430 U.S. 651, 676–82, 97 S.Ct. 1401, 1415–1418, 51 L.Ed.2d 711 (1977), under 42 U.S.C. § 1983. It is the approach taken by the Sixth Circuit in *Huynh Thi Anh v. Levi*, 586 F.2d 625, 632–34 (6th Cir. 1978), a case much like this one. A grandmother and uncle were seeking, though by a petition for habeas corpus rather than an action under 42 U.S.C. § 1983, to wrest custody of their grandchildren-nephews from the foster homes where the state's welfare and judicial officers had put them. The court held not only that state remedies had not been exhausted as required in habeas corpus cases, but also that there was no denial of due process, because the state remedies that were available to the plaintiffs were adequate. (The court bypassed the question whether the plaintiffs had a liberty interest to begin with. See *id.* at 632.)

The approach is appropriate in family-law cases because of the peculiarly local nature of that law. We are well aware that the Supreme Court has made inroads in recent years into this once secure preserve of states' rights. No longer can it be said that "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states and not the laws of the United States." *In re Burrus*, 136 U.S. 586, 593–94, 10 S.Ct. 850, 852–853, 34 L.Ed. 500 (1890). Yet recognizing that family law is peculiarly local, the federal courts continue to adhere tenaciously to the judge-made rule that excepts most domestic relations cases from the diversity jurisdic-

tion. See, e.g., *Solomon v. Solomon*, 516 F.2d 1018, 1024 (3d Cir. 1975). The relief sought in this case illustrates, if the point is not sufficiently obvious, why the federal courts are not the right tribunals to decide custody cases. The plaintiffs want a decree giving them the right to visit with the children periodically. The decree would require continuous judicial supervision and adjustment until the last child was grown up—feasible and familiar tasks for a local domestic relations judge but not for a remote, and in these matters totally inexperienced, federal district judge. The plaintiffs' damage claim does not present this problem, but damages are rarely an adequate remedy in a custody case; if we thought these plaintiffs were just after money we would doubt the good faith of their suit.

In noting that the plaintiffs apparently can still pursue certain remedies under Indiana law, we of course do not mean to prejudge the plaintiffs' rights under that law. And in holding that the due process required by the U.S. Constitution has not been denied them, we of course do not mean to prejudge any federal claims that the plaintiffs may acquire as a result of the conduct of the defendants in the ongoing proceedings in the Indiana courts relating to the custody of the children.

One question remains to be considered—whether the district court should have let the plaintiffs amend their complaint to add various allegations. Perhaps so (the court gave no reasons for its refusal); but the additional allegations are minor and would not, if taken to be true, change our conclusion that the judgment must be, and it is, affirmed. The motion to supplement the record on appeal, not being opposed, is granted.

SO ORDERED.