James E. NIEHUS and Denise Niehus,
Plaintiffs–Appellees, Cross–
Appellants,

v.

Vince LIBERIO and Frank Vittorio,
Defendants–Appellants, Cross–
Appellees.

Nos. 91–1534, 91–1635.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 18, 1992.
Decided Aug. 20, 1992.

Gary L. Starkman (argued), Ross & Hardies, Marc C. Smith, Arvey, Hodes, Costello & Burman, Timothy J. Touhy (argued), Ronald A. Stearney, Chicago, Ill., for plaintiffs-appellees.

Robert L. Shuftan, Kathy P. Fox (argued), Georgia L. Vlamis, Wildman, Harrold, Allen & Dixon, M. Jayne Rizzo, Mary K. Periolat, Kelley, Drye & Warren, Chicago, Ill., for defendants-appellants.

Before POSNER and KANNE, Circuit Judges, and VAN SICKLE, Senior District Judge.*

POSNER, Circuit Judge.

James Niehus was arrested on suspicion of drunk driving and brought to a police station in Berkeley, Illinois, a suburb of Chicago. He got into an argument with the police, and a fight ensued in the course of which—he testified—officers Liberio and Vittorio kicked him in the face, breaking his left cheekbone, as a consequence of which he suffered brain damage that has caused significant although not totally disabling mental and emotional injury. He sued the officers under 42 U.S.C. § 1983, charging that they had used excessive force against him in violation of his rights under the due process clause of the Fourteenth Amendment, and adding pendent state law claims of conspiracy and malicious prosecution, which however the judge dismissed. The jury awarded Niehus $336,320.59 in damages (all compensatory). The officers appeal, arguing that there was no credible evidence that they had caused his injuries and also complaining about two of the trial rulings. Niehus cross-appeals, arguing that the judge should not have withdrawn the conspiracy and malicious prosecution counts from the jury. His ex-wife also appeals. She was a plaintiff in the district court, arguing that the psychological injury inflicted by the defendants on her husband ruined her marriage and caused her to obtain a divorce from him. She claims that loss of consortium is a deprivation of liberty within the meaning of

the due process clause. The district judge disagreed.

The evidence regarding the cause and consequences of Niehus's broken cheekbone was vigorously contested and far from wholly satisfactory, but we cannot say that the judge should have taken the case away from the jury. Mr. Niehus, a conductor for a commuter rail line, got off work late one night and repaired immediately to a bar, where he played cards and drank beer until daylight. Well tanked, he got into his car and drove home. En route, after a ten-minute interlude in a coffee shop where he had gone to sober up, he turned into a lane of oncoming traffic and was struck. His car was propelled off the road and through a chain link fence, but it did not turn over and since he was wearing his shoulder-harness seatbelt he emerged from the car without apparent injury. His face was red and puffy, but that may have been due to his heavy drinking. He did not complain of any injury, and the officers and paramedic at the scene noted no signs of injury.

At the station house Niehus became obstreperous, in part he says because he was afraid that an arrest for drunk driving would jeopardize his status with his employer and with the army reserves, in which he is a sergeant. The police handcuffed one of his arms to the chair in which they had told him to sit. He demanded to be allowed to call his lawyer and to this end tried to slide his chair across the room to the telephone. The defendant officers tried to stop him. Niehus says that they started hitting him and that he fell on the floor and curled up with the left side of his face on the floor and his right arm over his head to protect him. He says they kicked him between five and fifteen times in the head while he was lying there and some of the kicks struck the left side of his face even though it was resting on the floor. They deny kicking him but of course that was an issue for the jury. They add that it was physically impossible for them to kick him in the left side of the face because that side of his face was against the floor, but

---

* Hon. Bruce M. Van Sickle of the District of    North Dakota, sitting by designation.

that is nonsense. Imagine kicking a soccer ball. The foot goes *under* the ball. And so with a head: a sharp kick to a face lying on the floor is quite likely to go under the face and, as all the medical witnesses agreed, can break a man's cheekbone. The defendants reply that the bone was broken in the car accident, and they point out that Niehus himself said so when he went to the hospital after being released from the station house on bond. But Niehus testified— not implausibly and certainly not incredibly—that he didn't want to reveal to the hospital that he had been arrested, because he was afraid that his employment and military-reserve status would be jeopardized. Niehus was in fact prosecuted for battery and drunk driving, but acquitted.

Niehus was sufficiently drunk when his car was struck that he mightn't have felt the pain of a broken cheekbone. But at least according to the defendants' lawyer he had (though this seems improbable) sobered up a lot by the time the altercation in the station house began several hours later, yet still he said nothing about a pain in his cheek until after the fight. The doctors testified as we said that the break was consistent with a kick though it could of course have been caused by Niehus's striking his head against the door of the car in the accident. If the jury believed, as it had every right to do, that Niehus was kicked in the left side of his face by the defendants, the fact that the cheekbone might have been broken already would not help the defendants. If you kick a person's freshly broken cheekbone you are likely to aggravate the injury substantially, and the "eggshell skull" or "thin skull" rule, *Stoleson v. United States*, 708 F.2d 1217 (7th Cir.1983); *Pieczynski v. Duffy*, 875 F.2d 1331, 1336 (7th Cir.1989); *Jordan v. Atchison, Topeka & Santa Fe Ry.*, 934 F.2d 225, 228–29 (9th Cir.1991); *Casey v. Fredrickson Motor Express Corp.*, 97 N.C.App. 49, 387 S.E.2d 177 (1990), would make the officers liable for the full consequences of their kicks even if, had it not been for a preexisting injury, the consequences would have been much less injurious. Oddly, the leading "eggshell skull" case also involved

a kick. *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (1891).

One does not associate a fractured cheekbone with permanent mental and psychological impairments, but reputable doctors testified that this fracture had injured Niehus's brain, precipitating cognitive and emotional disorders. The defendants did not contest this evidence directly. Nor did they exercise their right to have the plaintiff examined by a physician of their own choosing. Fed.R.Civ.P. 35. Instead they presented evidence that Niehus really hadn't changed much after the accident. They emphasized that he retained his job with the railroad and his reserve status— which includes a top secret clearance—and even passed with flying colors the proficiency tests that the railroad administers to its employees from time to time. They point out that the conductor is in charge of the entire train crew and it is hardly likely that the railroad would permit a man as impaired as the plaintiff's evidence suggests he was to remain in a position in which he was responsible for the safety of passengers as well as of other crew members.

Niehus's medical experts riposted that he had recovered to the point of being able to perform the thoroughly familiar routine of his railroad and military work but had lost his ability to adapt his thinking to changed circumstances. As a result of this mental inflexibility he had to exert the utmost concentration to perform his duties. And while he had retained his job he had not been able to retain his family, the damage to his brain having severely impaired his ability to maintain personal relationships. He had depression, continual pain in his head and neck, and other physical and psychological symptoms that cumulatively had made his life a misery and that are believed to be permanent.

■ The defendants certainly have a point that Niehus's retention of a responsible job involving the safety of numerous persons is in tension with the medical testimony about his cognitive deficiencies, and that psychiatric testimony about a person's personality and the causes of his failed

marriage is inherently speculative. But we cannot say that the jury took leave of its senses in believing the plaintiffs' witnesses, especially since the defendants forwent their opportunity to have Niehus examined by a physician of their own choosing. For all we know the commuter line and the U.S. Army Reserves alike are negligent in retaining Niehus in their employ but that cannot abrogate his right to damages for the pain and suffering inflicted by the defendants' brutal assault. If he had been fired, his damages would be even greater.

The defendants argue that even if their kicks caused the injuries complained of, the verdict was excessive. In support they list the damages awards in what they describe as "similar" cases of excessive force in this circuit. The awards were indeed lower in the cases they list, but the injuries were less severe. If as we believe the evidence permitted the jury to find that the defendants had inflicted the mental and psychological injury to which Niehus's ex-wife and medical experts testified, an award of $336,000 cannot be considered excessive.

Although the judge threw out the conspiracy count, he allowed the plaintiffs' lawyer to intimate that the Berkeley police department had engaged in a "cover up," and he also gave the jury a "missing evidence" instruction. The two rulings, to which the defendants vigorously except, are related. The defendants testified that right after the fight with Niehus in the station house they took mug shots of him, but that when later they looked for the photos in Niehus's file they couldn't find them. They speculate that the camera was broken in the fight. But there was testimony, which the jury was entitled to believe, that the same camera was working fine the next day. And right after the fight the officers had talked with their supervisor by phone and the phone conversation had been routinely taped, but the tape was never produced. One employee of the police department testified that the tape was erased routinely, but another testified that the tape recorder was malfunctioning on the day of the fight, and the jury may have thought that this was one excuse too many. A third employee, whose job it was to monitor conversations in the booking room where the fight occurred, gave contradictory testimony about what she heard.

■ To preserve their objection to the "missing evidence" instruction, the defendants had to state—"distinctly," too—the grounds for the objection as well as the objection itself. Fed.R.Civ.P. 51. The judge conducted the instructions conference in chambers, with no court reporter present. But when the judge and the lawyers returned to the courtroom, the judge told the lawyers to make their objections on the record, and they did so. He did not tell them to state the *grounds* for their objections on the record, however. The defendants' lawyer has submitted an affidavit, not contradicted, that she stated those grounds in the unrecorded session in the judge's chambers. The plaintiffs argue that this is not good enough. However, nothing in the text of Rule 51 requires that the objection be stated on the record; and the main purpose of the rule—to give the judge a chance to correct an error that might require a reversal and new trial, *Guerts v. Barth*, 892 F.2d 622, 624 (7th Cir.1989)—does not require that the objection be recorded. *United States v. Murphy*, 768 F.2d 1518, 1536 (7th Cir.1985), holds, accordingly, that neither the objection nor the grounds for it need be recorded in order to be preserved. Two later cases hold that if the judge offers the lawyers an opportunity, after the unrecorded instructions conference, to state their objections for the record, and they fail to do so, any objections they raised at the conference will be considered abandoned. *United States v. O'Malley*, 796 F.2d 891, 894 n. 2 (7th Cir.1986); *Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1106–07 (7th Cir.1990). These cases give more weight to the importance of recording objections and the grounds for the objections, in order to avoid disputes over whether Rule 51 really was complied with, than *Murphy* did. See also *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1157 (7th Cir.1989). But there is no inconsistency. The better practice for the judge

who decides not to conduct the entire instructions conference on the record is to direct the lawyers to state the grounds of their objections, as well as the objections themselves, for the record. If the lawyers don't comply with this direction—a reasonable one well within a district judge's broad discretion to manage litigation in his court—the proper sanction is to make them forfeit their objections. But the judge in this case did not ask the lawyers to state the grounds of their objections for the record, so their failure to do so is not sanctionable. We repeat that the rule itself does not require the recording of objections or the grounds for them. The uncontradicted affidavit by the defendants' lawyer thus establishes that there was no violation of Rule 51.

■ As far as the cover up is concerned, the indications that the defendants in concert with other employees of the police department tried to suppress evidence of their use of excessive force against Niehus were sufficiently numerous and plausible to warrant comment by the plaintiffs' lawyer. Here were the defendants in their testimony strenuously contradicting Niehus's testimony and yet there was a fair probability that they had engaged in active efforts to prevent that testimony from being corroborated by the mug shots, the tape recording, and the employee who heard the fight over the monitoring system. The plaintiffs' lawyer was entitled to invite the jury's attention to these suspicious circumstances.

The judge instructed the jury that if a party had failed to offer evidence that was within its power to produce, the jury could infer that the evidence was adverse to that party, provided that (1) the evidence was under the party's control, (2) the evidence was not equally available to the opposing party, (3) the party would have offered the evidence had it been favorable to him, and (4) no excuse had been shown for the failure to produce it. This instruction was drawn from the Illinois pattern instructions, and the parties agreed that it was an accurate statement of the requirements for a "missing instruction" law, which maybe

they should not have done, but they are bound by this agreement. *Price v. Pierce,* 823 F.2d 1114, 1119 (7th Cir.1987).

■ Federal, not state, evidentiary law governs a federal trial, save with respect to some matters of privilege not involved in this case, *Barron v. Ford Motor Co.,* 965 F.2d 195, 198–99 (7th Cir.1992), and we have not found a federal case that discusses the elements of the missing-evidence doctrine. But we have our doubts, unnecessary to resolve in light of the plaintiffs' failure to object to the pattern instruction, about the cumbersome test set forth in that instruction. We are not sure why there should be a requirement of proving "control," or even why the evidence must be inaccessible to the other party (i.e., the party seeking the missing-evidence instruction). Those are subparts (1) and (2) of the pattern instruction; as for (4), it is implicit in the requirement that the party could have produced the evidence. One might have supposed that it should be enough that the party could have produced the evidence and that he surely would have done so had the evidence been favorable to him—implying that the evidence was in fact not favorable to him. 2 *Wigmore on Evidence* § 291, at 226 (James H. Chadbourn rev.1979). Missing-witness cases, it is true, which are as numerous as missing-evidence cases are rare, often speak of "a witness under the control of the adverse party." *United States v. Sblendorio,* 830 F.2d 1382, 1394 (7th Cir.1987). But this may be shorthand for the fact that no adverse inference can be drawn from the failure to call as a witness a person who was not *"within the power* of the party to produce" (2 *Wigmore on Evidence, supra,* § 286, at p. 199 (emphasis in original)), because he was beyond the subpoena power of the court, or his whereabouts were unknown, or he had a privilege not to testify, or whatever. The importance of control (as where the missing witness is the party's agent) is that a party should not be allowed to obtain an advantage from placing a witness beyond the reach of his adversary. Control will sometimes be important in a missing-evidence case for the same reason—to furnish the ground for a rejoinder

to a party who seeks to counter a missing-evidence argument by asserting that the evidence was equally accessible to his opponent. It does not follow, however, that control should be a necessary condition for giving such an instruction.

Against this it can be argued that the missing-evidence rule should be interpreted narrowly (perhaps by loading on threshold requirements, as in the Illinois pattern instruction) because in an age of easy—some would say promiscuous—pretrial discovery the most natural explanation of why evidence is missing from a trial is simply that neither side saw an advantage to introducing it. The rule could be confined to cases in which discovery was thwarted by the stonewalling tactics of the opposing party; the requirements in the Illinois pattern instruction are consistent with such an approach. But discovery is burdensome and costly, so should not be encouraged overmuch; and if it is made a prerequisite to a missing-evidence instruction, this may incite collateral debate over whether discovery was sufficiently pointed and vigorous. Perhaps therefore it should be enough that there is evidence that a party would surely have introduced had it been helpful, permitting an inference that the evidence would instead have helped his opponent.

Although the defendants gave plenty of excuses for why they failed to produce the mug shots or the (allegedly) broken camera or the tape recording or the (allegedly) malfunctioning tape recorder, there was enough reason to believe that they could and would have produced this evidence had it been favorable to them to warrant the missing-evidence instruction. The evidence of a cover up is highly pertinent here. Given the degree of cooperation evident among the employees of the Berkeley Police Department, it is nearly certain that the custodian of the evidence would have made it available to the defendants had it been helpful to them.

By giving the Illinois pattern instruction, however, the judge armed the defendants to argue that they didn't have control of the camera, tape recorder, etc. The police department had control, and it is not a defendant. This argument brings out the vagueness of the term "control" in this context, and the mischievousness of complicated legal tests. Instead of asking the important question, namely whether the defendants could produce the evidence in question, the Illinois test required the court to determine separately whether they had "control" of the evidence, which sounds like an inquiry into rights of possession and chains of custody. But we think the defendants waived the issue of control when, in answer to the plaintiffs' interrogatories, they said they had the mug shots. Whether they did or didn't, by saying they did they deflected the plaintiffs from pursuing the matter by discovery aimed at determining the custody of the mug shots and, failing them, the camera. So this is a case in which the defendants frustrated the plaintiffs' efforts to obtain helpful evidence through discovery—the very case, in short, for which the standard in the pattern instruction was intended.

■ We turn to the cross-appeal. We can be quick in disposing of the argument that the judge should not have dropped the conspiracy and malicious-prosecution counts. The plaintiffs' lawyer acknowledged at argument that these counts would be moot if we affirmed the judgment for Niehus, since the conspiracy and malicious prosecution are not alleged to have inflicted any injury beyond that of the excessive force itself. Niehus is not seeking damages for his legal expenses in defending against the malicious-prosecution charge or in penetrating the cover up, or any other form of damages that might be independent of the mental and physical suffering for which the jury compensated him. We are not clear why the judge thought there was enough evidence of conspiracy to allow the plaintiffs' lawyer to refer to the cover up—which *was* the alleged conspiracy—but not enough to allow the jury to decide whether the defendants had actually participated in a conspiracy. The issue is academic, however, as we have said and we add only that it is not anomalous that the only utility of the conspiracy charge to the plaintiffs was evidentiary. There is no tort

without an injury, *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990); *Heil v. Morrison Knudsen Corp.*, 863 F.2d 546, 550 (7th Cir.1988), and this is as true of constitutional as of ordinary torts, *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983); *Garza v. Henderson*, 779 F.2d 390, 395 (7th Cir.1985); *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir.1988). So an interrupted conspiracy will usually not be actionable, while a completed one will inflict no injury over and above the tort that the conspirators had conspired to commit. All this makes civil conspiracy, outside of such special cases as antitrust and labor, a rather exotic plant in the legal greenhouse. Perhaps, apart from its evidentiary use, and its use in spreading the net of liability to additional persons, *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988); *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983), there are cases in which the conspiracy, though interrupted, inflicted harm through one of its overt acts, conceivably not tortious in itself. In such cases, perhaps the tort of civil conspiracy would fill a gap in tort law. Or perhaps not; perhaps such cases would founder on a lack of an adequate causal relation between the conspiracy and the injury. We needn't decide.

▮ The unavoidable question raised by the cross-appeal is whether Denise Niehus, who attributes the breakup of her marriage to the psychological consequences of her husband's injury, can recover damages *under the Constitution* for loss of consortium. (This issue was expressly reserved in *Bell v. City of Milwaukee*, 746 F.2d 1205, 1244 n. 48 (7th Cir.1984). There are no appellate decisions on it. For scholarly analysis see Michael S. Bogren, "The Constitutionalization of Consortium Claims," 68 *U.Det.L.Rev.* 479 (1991).) She could have brought a claim under state law for loss of consortium and attempted to append that claim to her husband's as a pendent-party claim. The attempt probably would have failed, *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989); *Stallworth v. City of Cleveland*, 893 F.2d 830, 838 (6th Cir.1990); *Ortega v. Schramm*, 922 F.2d 684 (11th Cir.1991) (per curiam); *Sarmiento v. Texas Board of Veterinary Medical Examiners*, 939 F.2d 1242, 1247–48 (5th Cir.1991), save in the First Circuit. *Rodriguez v. Comas*, 888 F.2d 899, 905–06 (1st Cir.1989). Although 28 U.S.C. § 1367(a) restores pendent party jurisdiction, it is applicable only to suits brought since December 1, 1990, and this suit was filed earlier, so the case law cited above governs. At all events, Mrs. Niehus made no state-law claim for loss of consortium but instead staked her all on convincing Judge Zagel and us that loss of consortium is a deprivation of "liberty" within the meaning of the due process clause.

There would be no novelty in interpreting "liberty" to embrace the right of sexual companionship in marriage. The Supreme Court has placed the freedom to marry in the firmament of liberties protected by the due process clause, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Zablocki v. Redhail*, 434 U.S. 374, 383–86, 98 S.Ct. 673, 679–81, 54 L.Ed.2d 618 (1978); *Turner v. Safley*, 482 U.S. 78, 94–99, 107 S.Ct. 2254, 2265–67, 96 L.Ed.2d 64 (1987), and the sexual dimension of marriage, one of the principal interests encompassed by the right to consortium, W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* § 125, at p. 931 (5th ed. 1984), was singled out for constitutional protection in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Although we may assume that the states have a free hand to deny sexual rights to married prisoners, cf. *Turner v. Safley, supra,* 482 U.S. at 95–96, 107 S.Ct. at 2265, that obviously is a special situation. See also *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). It is also consistent with recognition of an underlying liberty, since liberties are not absolute. Setting prisons to one side, we may assume that if the Village of Berkeley decreed that married couples shall live in separate houses except on weekends it would be invading a form of liberty protected by the due process clause. Cf. *Ellis v. Hamilton*, 669 F.2d 510, 512 (7th Cir.1982). Other family associations, such as that between parent and child or

even grandparent and grandchild, have likewise been held to be aspects of liberty protected by the Fourteenth Amendment. *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Bell v. City of Milwaukee, supra,* 746 F.2d at 1242–45; *Lossman v. Pekarske,* 707 F.2d 288 (7th Cir.1983); *Ellis v. Hamilton, supra;* see also *Mayo v. Lane,* 867 F.2d 374, 375 (7th Cir.1989).

Wrongful-death suits brought under section 1983 by domiciliaries of states in which the wrongful-death statute is conceived of as conferring a right on the decedent's survivors rather than on his estate—*Bell v. City of Milwaukee, supra,* was such a case, and several similar ones are cited in Bogren, *supra,* at 486–88—provide a particularly apt analogy to Mrs. Niehus's claim, because the suit is allowed even though the plaintiff was not the target of the wrongful conduct. These cases have, it is true, evoked a measure of skepticism in other circuits, especially now that the Supreme Court has held that negligent infliction of harm is not actionable under section 1983. *Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986). As one of our sister circuits said in a case in which a grandmother was seeking damages for the death of her grandchild as a result of wrongful state action, "Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct." *Harpole v. Arkansas Department of Human Services,* 820 F.2d 923, 928 (8th Cir.1987); see also *Valdivieso Ortiz v. Burgos,* 807 F.2d 6, 8 (1st Cir.1986). But the common law doctrine of transferred intent, *In re EDC, Inc.,* 930 F.2d 1275, 1279 (7th Cir.1991), protects the holding of *Bell* from attack based on *Daniels.* If A aims at B, and hits C, C can sue A for battery, even though he was not the intended victim and even though battery is an intentional tort. C can of course still sue A if A hits B as well as C. The plaintiff in a survivor's wrongful-death suit is C, the decedent B, the defendant A—so here Mr. Niehus is B, Mrs. Niehus is C, and the defendants are A.

This extension of *Bell* to consortium is neat and logical but not convincing. Concerned to keep section 1983 from swallowing the whole of the states' law of public-officer torts, the courts have confined "liberty" to the core of personhood. Even bodily integrity is not protected completely; minor assaults and batteries are not actionable as deprivations of constitutional liberty. See cases cited in *Cameron v. Internal Revenue Service,* 773 F.2d 126, 129 (7th Cir.1985); cf. *Kunik v. Racine County,* 946 F.2d 1574, 1579 (7th Cir.1991); *Hudson v. McMillian,* —— U.S. ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). Turning from body to spirit, we point out that minor interferences with peace of mind are also not actionable, *Cameron v. Internal Revenue Service, supra,* 773 F.2d at 129—nor all major ones. Though some may be, *Wilkins v. May,* 872 F.2d 190, 195 (7th Cir.1989), even the shock that a bystander might experience from witnessing a shooting is not, and this even if the bystander is the shooting victim's wife. *Coon v. Ledbetter,* 780 F.2d 1158, 1160–61 (5th Cir.1986); see also *Archuleta v. McShan,* 897 F.2d 495 (10th Cir.1990). Major harms to reputation are not actionable either; defamation by public officers is not a constitutional tort. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Even the panel that decided *Bell* thought a limiting principle necessary, and held that the siblings of the victim could not sue for the loss of his companionship. 746 F.2d at 1245–48. A grandparent suit was nixed on similar grounds in *Harpole,* and a suit by the mother, stepfather, and siblings of an adult in *Valdivieso Ortiz.*

The relationships that define the nuclear family—relationships that for many people are constitutive of their very identity—are protected, as we have seen, and if consortium were a synonym for marriage Mrs. Niehus would have a stronger claim, though whether strong enough we need not speculate. But consortium is not a synonym for marriage. It is the name of the sexual and other services (apart from financial support) that spouses render to

each other. *Tribble v. Gregory*, 288 So.2d 13, 16 (Miss.1974). A loss of consortium can therefore be as minor and transient as a wife's losing a month's help from her husband in mowing the lawn and washing the dishes and grooming the cat, cf. *Blansit v. Hyatt Corp.*, 874 F.2d 1015, 1018 (5th Cir.1989) (raking leaves); *Orlando Regional Medical Center, Inc. v. Chmielewski*, 573 So.2d 876, 881 (Fla.App.1990) (dancing), and as major as the loss of all spousal services consequent upon an injury that renders the injured spouse a human vegetable.

Deprivations of the lesser services comprehended in the portmanteau term "consortium" are not deprivations of liberty within the restricted meaning that the term bears in the Constitution. The right to a husband's assistance in raking leaves is not a liberty protected by the Fourteenth Amendment. But Mrs. Niehus does not ask us to confine the constitutional right of consortium to the greater deprivations. She wants us to rule that consortium is liberty, period. We decline the invitation. Nor are we eager on our own to fix a point on the scale from the smallest to the largest loss of consortium and say that above that point the Constitution provides a remedy but below it not. Whether (as here) the plaintiff's marriage actually broke up cannot be the criterion, for that would encourage people to divorce in order to maximize their prospects for bringing a claim for loss of consortium under federal law. We add that the authority newly conferred by Congress to join a state-law claim for consortium with the spouse's constitutional claim, and thus bring both in federal court, will enable persons similarly situated to the Niehuses to obtain full compensation in a single proceeding. That will make the question whether consortium is a constitutionally protected liberty largely an academic one in future cases.

AFFIRMED.