Charles W. MILLER; Patricia A. Miller, Plaintiffs–Appellants,

v.

State of CALIFORNIA, Department of Social Services, Defendant,

and

Yuba County Human Services Agency; Child Protective Services; Evelyn Joslin; Mike Noda; Phyllis Bullard; Penny Elliott; Ginny Tuscano, Defendants–Appellees.

No. 02–16780.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2003.

Filed Jan. 22, 2004.

Roderick L. MacKenzie, MacKenzie & Brody, Sacramento, California, for the plaintiffs-appellants.

Jennifer E. Duggan, Terence J. Cassidy, Avery E. Dority, Porter, Scott, Weiberg & Delehant, Sacramento, California, for the defendants-appellees.

Before BRIGHT,[*] D.W. NELSON, and RYMER, Circuit Judges.

RYMER, Circuit Judge.

We must decide two related questions arising out of a protracted and contentious dependency dispute: whether noncustodial grandparents, acting as de facto parents to grandchildren who are dependents of the juvenile court, have a substantive due process right to family integrity and association with those grandchildren; and whether placing the grandfather's name on the California Child Abuse Central Index (CACI) violates his constitutional right to due process.

Charles and Patricia Miller are grandparents of three young girls who had been removed from their natural parents because of neglect. They brought an action under 42 U.S.C. § 1983 against the County of Yuba, Yuba County Human Services Agency, Yuba County Child Protective Services (CPS), and CPS employees,[1] for

---

[*] Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. The complaint names the State of California as well as Yuba County CPS employees Mike Noda, Evelyn Joslin, Phyllis Bullard, Penny Elliott, and Ginny Tuscano. The district court dismissed the action against the state and the

conspiring to deprive them of the right to family integrity and for placing Charles Miller's name on the CACI. The district court granted Yuba County's motion for summary judgment, concluding that the Millers have no constitutional right to visit their grandchildren when the children are dependents of the juvenile court, and CPS, as well as the children's biological mother, agree that visitation should cease. The court also held that the Millers failed to show loss of a recognizable property or liberty interest in conjunction with injury to their reputation from placement of Charles Miller's name on the index, and so failed to satisfy the "stigma-plus" test required to support a claim for defamation under § 1983. We agree and, as we have jurisdiction pursuant to 28 U.S.C. § 1291 and no other issue merits reversal, we affirm.

## I

The Millers' grandchildren were removed from their parents' home in May 1994 by the Yuba County CPS. The three girls were declared dependents of the Yuba County Juvenile Court on June 21, 1994, and were placed with the Millers, their paternal grandparents. The mother left California in November 1994 and reunification services for her were terminated June 22, 1995; the court ordered that the children would remain in the Millers' home. After returning to California in September 1995, the mother successfully petitioned for visitation. A March 1996 petition for return of the children was denied. However, in August 1996, at the recommendation of CPS, the mother was given six additional months of reunification services. The court ordered placement of the minor children in the home of their maternal grandmother to facilitate the reunification efforts, and granted visitation rights to the Millers.

In October 1996, a call to CPS from the office of the girls' doctor raised concerns about possible sexual abuse. The children were examined at the University of California Davis Medical Center Child Protection Unit. As a result, all visitation with the children was terminated. Penny Elliott, a CPS social worker, interviewed the girls, and on October 17 submitted a Child Abuse Investigation Report to the California Department of Justice pursuant to California Penal Code § 11169 to have Charles Miller's name placed on the Child Abuse Central Index. However, his name was not placed on the index because his birthdate was mistakenly omitted. The Millers were not interviewed by CPS, nor were they notified of this report as the Penal Code did not then require that suspected child abusers be given notice.

In February 1997 the juvenile court transferred the case under a family maintenance plan to Sutter County, where the mother had moved. The Yuba City Police Department and the Sutter County CPS then investigated the sexual molestation charges. Interviews with the children did not disclose molestation, so the Yuba City Police Department closed the case.

The Millers were granted supervised visitation by the Sutter County Juvenile Court in May 1997, and in August were granted unsupervised visitation and de facto parent status. Apparently the mother began to neglect her children again in late 1997, and allowed the girls to spend weekends with the Millers and to live continuously with them from January 9, 1998 until February 12, 1998. At that point the mother took the girls to Arizona, then to Alaska, as a result of which the Millers

individuals in their personal capacities, which the Millers do not appeal. We will refer to

the Yuba County parties collectively as Yuba County, unless context requires otherwise.

filed for guardianship in June 1998. Guardianship was granted on October 16, 1998. The Millers have had custody ever since.

Meanwhile, in July 1998 the Millers met with the Director of the Yuba County Department of Health and Human Services, which oversees CPS, to ask for an investigation to clear their names. On September 3, 1998, the original Child Abuse Investigation Report was resubmitted to the California Department of Justice. This resulted in Charles Miller's name being listed on the CACI. As California Penal Code § 11165 et seq. had been amended to require, a Notice of Report to the Child Abuse Central Index was sent to Charles Miller on September 4, 1998.

The Millers filed suit, and have timely appealed from the summary judgment entered in favor of Yuba County.[2]

## II

■ The Millers argue that they have a substantive due process right to family integrity under the Fourteenth Amendment because they had assumed the role of parents to their grandchildren by providing for their care, comfort, and protection as well as their physical and psychological needs for a substantial period of time. They submit that de facto parents are entitled to the same protections extended to nuclear and biological families. The Millers point out that Rule 1401(a)(8) of the Juvenile Court Rules of the California Rules of Court defines a "de facto parent" as "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." They

also note that they attended all of the juvenile court proceedings and are a "parent or other person having an interest in a child who is a dependent child" within the meaning of California Welfare and Institutions Code § 388. Given this long-standing relationship, the Millers assert that they have raised a triable issue of fact that Yuba County and CPS social workers conspired to deny them their right to associate with their grandchildren, culminating in CPS's accusing Charles Miller of sexually molesting the girls. As they see it, placing Miller's name on the CACI was intended to, and did deprive the Millers of their constitutionally protected liberty interest in associating with their grandchildren.

■ While there is no question that *parents* have a constitutionally protected liberty interest in making decisions about the care, custody, and control of their children, *see, e.g., Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion); *Lee v. City of Los Angeles,* 250 F.3d 668, 685 (9th Cir. 2001) (citing *Kelson v. City of Springfield,* 767 F.2d 651 (9th Cir.1985)), we have never held that any such right extends to *grandparents.* The Millers rely upon *Drollinger v. Milligan,* 552 F.2d 1220, 1226–27 (7th Cir.1977), which recognized that grandparents should enjoy the same constitutional protection afforded to the nuclear family. However, as we observed in *Mullins v. Oregon,* 57 F.3d 789, 796(9th Cir.1995), that opinion is not helpful: the *Drollinger* court never explained its decision and the Seventh Circuit later questioned its precedential value in *Ellis v.*

---

**2.** We review the district court's grant of summary judgment de novo. *United States v. City of Tacoma, Wa.,* 332 F.3d 574, 578 (9th Cir. 2003). Viewing the evidence in the light most favorable to the Millers, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

*Hamilton,* 669 F.2d 510, 513 (7th Cir. 1982).

As we also noted in *Mullins,* there is no authority for "the proposition that a grandparent, by virtue of genetic link alone, enjoys a fundamental liberty interest in the adoption of her grandchildren." 57 F.3d at 794. Although the Millers emphasize that they were not trying to adopt their grandchildren, just to associate with them, there was no existing family unit of which they were a part that Yuba County sought to break asunder; the grandchildren were, in fact, wards of the court at all relevant times. The Millers' interests in this case conflicted with the interests of the girls' mother and their maternal grandmother, both of whom were also seeking to have the girls live with them instead of the Millers. This distinguishes *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), upon which the Millers rely. In *Moore,* there were no conflicting interests at stake in the grandchildren's living arrangement, and there was no suggestion that the grandmother was in any way unfit to care for her grandson. *Cf. Troxel,* 530 U.S. at 71–73, 120 S.Ct. 2054. Here, with the agreement of the children's biological mother and CPS, the Millers' visitation rights were temporarily cut off after the girls were placed with the maternal grandmother and were prohibited altogether in the wake of evidence that the girls may have been sexually abused. This is consistent with *Troxel's* recognition that a grandparent's interest in visiting grandchildren may conflict with a biological parent's right to make decisions about the child. *See* 530 U.S. at 71–73, 120 S.Ct. 2054.

In sum, we see no basis for holding that the Millers had a substantive due process right to visit their grandchildren when those children were dependents of the court, and CPS and the children's biologi-

cal mother agreed that visitation should cease.

 Nor does the fact that the Millers were "de facto" parents under California law for purposes of the juvenile court proceedings create a liberty interest in contact with the children. A liberty interest may arise from positive law sources, but "it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 845–46, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). In California, a de facto parent is one who "on a day-to-day basis, assumes the role of parent, seeking to fulfill both the child's physical needs and his psychological need for affection and care." *In re Crystal J.,* 92 Cal.App.4th 186, 190, 111 Cal.Rptr.2d 646 (2001) (quoting *In re B.G.,* 11 Cal.3d 679, 692 n. 18, 114 Cal.Rptr. 444, 523 P.2d 244 (1974)). A de facto parent has an interest in the care of the child that is entitled to legal protection; however, de facto parents are not equated with biological parents. "[D]e facto parent status provides the de facto parent only the right to be present, to be represented and to present evidence in a dependency proceeding." *Id.* at 191, 111 Cal.Rptr.2d 646. Thus, being de facto parents simply gave the Millers the right to appear in the proceeding, which was not denied. It conferred no other, or weightier interest of constitutional dimension.

Accordingly, the Millers have established neither a substantive due process right to family integrity or association as noncustodial grandparents of children who are dependents of the court, nor of a liberty interest in visiting their grandchildren in the circumstances of this case. Because they have failed to establish a constitutional right of which they were deprived, the district court properly determined that the Millers established no claim against Yuba

County. *See, e.g., Van Ort v. Estate of Stanewich,* 92 F.3d 831, 835 (9th Cir.1996) (holding that for municipal liability to exist, plaintiffs must establish a constitutional right of which they were deprived in addition to showing that the municipality had a custom or policy that amounts to deliberate indifference to the right and was the moving force behind the constitutional violation). As their conspiracy claim likewise turns on denial of a constitutional right, it fails for the same reason.[3]

### III

In a separate, but related, argument, the Millers challenge placement of Charles Miller's name on the CACI. They, contend that this not only impugned his reputation but limited his freedom of action, freedom of association, and freedom of activity. Further, they submit, listing his name on the index constituted a denial of procedural due process because Charles Miller was classified as a child abuser without any opportunity to be heard. In their view, this combination satisfies the stigma-plus test of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

The index is a creature of the California Child Abuse and Neglect Reporting Act (CANRA), Cal.Penal Code §§ 11164 et seq. CANRA is "premised on the belief that reporting suspected abuse is fundamental to protecting children." *Stecks v. Young,* 38 Cal.App.4th 365, 371, 45 Cal. Rptr.2d 475 (1995). Under the Act, child protective agencies are required to forward "child abuse reports (except unfounded reports) to the Department of Justice, which then maintains an index of such reports." *People ex rel. Eichenberger v. Stockton Pregnancy Control Med. Clinic, Inc.,* 203 Cal.App.3d 225, 242, 249 Cal.

Rptr. 762 (1988); Cal.Penal Code §§ 11169, 11170. An agency may not forward such a report unless it has conducted an active investigation and determined that the report is not unfounded. An "unfounded report" is a report that is determined by the investigator who conducted the investigation to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect. Cal.Penal Code § 11165.12(a). A report may be "substantiated" or "unsubstantiated." A "substantiated report" means one that the agency determines is based upon some credible evidence; an "unsubstantiated report" is one that is not unfounded but in which the findings are inconclusive and there exists insufficient evidence to determine that child abuse or neglect occurred. *Id.* § 11165(b), (c). If a previously filed report later proves to be unfounded, the Department of Justice must be notified and may not retain it. *Id.* § 11169(a)(1). Otherwise, it remains on the CACI for ten years. *Id.* § 11170(a)(3). The reports maintained on the index are not public documents, *Planned Parenthood Affiliates v. Van de Kamp,* 181 Cal. App.3d 245, 260, 226 Cal.Rptr. 361 (1986), but information on the index is available when pertinent to a known or suspected instance of child abuse or severe neglect to the child's guardian, custodian, counsel or medical practitioner, or to a state or county agency that makes an inquiry to the Department of Justice "concerning any person who is an applicant for licensure or any adult who resides or is employed in the home of an applicant for licensure or who is an applicant for employment in a position having supervisorial or disciplinary power over a child or children, or who will provide 24–hour care for a child or

---

**3.** The conspiracy claim fails for the additional reason that the evidence upon which the Millers rely at most shows hostility toward them by CPS social workers and counsel, but no

meeting of the minds to violate their constitutional rights. *See Woodrum v. Woodward County, Ok.,* 866 F.2d 1121, 1126 (9th Cir. 1989).

children in a residential home or facility...." Cal.Penal Code § 11170(b)(1), (3).

▮ No doubt the Millers raised a triable issue of fact that being falsely named as a suspected child abuser on an official government index is defamatory. The district court so found, and Yuba County does not contest the obvious. However, as the Court held in *Paul v. Davis,* reputational harm alone does not suffice for a constitutional claim. 424 U.S. at 702, 96 S.Ct. 1155. Rather, to support a claim under § 1983, the Millers must show that the stigma was accompanied by some additional deprivation of liberty or property. *Id.* at 708–09, 96 S.Ct. 1155. We refer to this as the "stigma-plus" test, and have held that the "plus" must be a deprivation of liberty or property by the state that directly affects the plaintiff's rights. *Cooper v. Dupnik,* 924 F.2d 1520, 1533 (9th Cir. 1991).

The Millers fault the district court for holding that they lack a fundamental liberty interest in preserving family association and therefore fail to satisfy the "plus" element under 764 *Paul v. Davis.* However, for reasons we have already explained, there is no "plus" here on account of an asserted substantive due process right to family integrity or association, or on account of a liberty interest in visitation as a de facto parent.

*Paul* itself is instructive, as it also involved a stigmatizing list. The Louisville Chief of Police placed Davis's name on a flyer distributed to 800 merchants in Louisville, describing him as a person who had been arrested for shoplifting. Though Davis had been arrested on a shoplifting charge, his guilt or innocence had never been determined. Davis defended the propriety of his § 1983 action by arguing that he had been inhibited from entering some business establishments and that his employment opportunities had been impaired, but the Court observed that the interest in reputation alone is different from the interest in liberty or property that is required to trigger the procedural guarantees of the Due Process Clause of the Fourteenth Amendment. *Paul,* 424 U.S. at 711, 96 S.Ct. 1155. As Kentucky did not extend any legal guarantee of present enjoyment of reputation that was altered by the Police Chief's conduct, the Court held that Davis's interest in his reputation was neither liberty nor property guaranteed against state deprivation without due process. *Id.* at 711–12, 96 S.Ct. 1155. The same is true in this case. Even though to be accused of child molestation may be more opprobrious than to be accused of shoplifting, still a cognizable constitutional wrong must be joined with the defamation claim in order to state a stigma-plus claim. *See Buckey v. County of Los Angeles,* 968 F.2d 791, 795 (9th Cir. 1992).

The Millers contend that more than Charles Miller's reputation is involved because his status to engage in child rearing and family association was affected just like the status of the person singled out as a drunkard was altered in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *Constantineau,* the Chief of Police of Hartford had posted a notice to all retail outlets that sales or gifts of liquors to Constantineau were forbidden for one year. This was done pursuant to a Wisconsin statute that provided for posting when a person caused himself or his family "to want" or became "dangerous to the peace" of the community by "excessive drinking." Constantineau brought suit to have that statute declared unconstitutional. The Court held that it was, because the Wisconsin Act contained no provision for notice and hearing, and notice and an opportunity to be heard are essential where a person's good name, reputation, honor, or integrity are at issue on account of what the government is doing to

him. *Id.* at 437, 91 S.Ct. 507. However, as the Court explained in *Paul*, the posting in *Constantineau* altered Constantineau's status as a matter of state law, and "it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." *Paul*, 424 U.S. at 708–09, 96 S.Ct. 1155.

The Millers have suffered no similar change of legal status. Whereas once listed, Constantineau legally could not do something that she could otherwise do—buy alcoholic beverages—the Millers are not legally disabled by the listing alone from doing anything they otherwise could do. Indeed, the Millers were awarded guardianship of the girls by order of the Sutter County Juvenile Court after Charles Miller's name was put on the index. Thus, the district court correctly concluded that the Millers did not satisfy the stigma-plus test because they failed to show loss of a recognizable property or liberty interest in conjunction with injury to their reputation.[4]

AFFIRMED.

---

4. We decline to address two remaining arguments. The Millers argue that placing Charles Miller's name on the CACI was a denial of procedural due process because CANRA provides no procedure by which those suspected of being child abusers can challenge the allegations against them. The district court did not consider this alleged deprivation as it was raised for the first time in a supplemental brief, and this decision is not an issue on appeal. Finally, the Millers argue that their right of access to the courts will be denied if the state grants its public officials immunity from defamation actions. This was not presented to the district court and is premature in any event as the supplemental claims were dismissed without prejudice.