52 F.3d 1448
 31 Fed.R.Serv.3d 1040
 Jane DOE, a Minor, By and Through her Guardians and Next
Friends, G.S. and M.S., Plaintiffs-Appellants,
v.
Gordon JOHNSON, Gary T. Morgan, Illinois Department of
Children and Family Services, et al., Defendants-Appellees.
 No. 94-1536.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1994.
Decided April 18, 1995.
 
 Roy P. Amatore (argued), John L. Malevitis, Nevoral & Associates, Chicago, IL, for Jane Doe, a Minor, By and Through her Guardians and Next Friends, G.S., M.S.
 Paula Giroux, Asst. Atty. Gen., Chicago, IL, for Gordon Johnson, Gary T. Morgan, Illinois Dept. of Children and Family Services, Zettie Wesley.
 Thomas F. Lucas (argued), Peterson & Ross, Chicago, IL, for Tag, Inc.
 Steven C. Wolf, Patrick M. Ouimet, Kim Giobbia, Wolf & Ouimet, Chicago, IL, for Susan Clement.
 Edward S. Richman, Chicago, IL, for Robin Swaziek, David Swaziek.
 Before POSNER, Chief Judge, REAVLEY* and COFFEY, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 The plaintiffs filed claims on behalf of their minor daughter, Jane Doe, against Tag, a foster care agency, and Robin and David Swaziek, Doe's former foster parents. Their complaint charged that her former foster parents inflicted intentional emotional distress when they abused Doe both sexually and physically and that Tag, the agency responsible for Doe's placement, and its employees were grossly negligence with respect to their supervision of her placement. The plaintiffs sought to recover the expenses of psychological treatment Doe received as a result of the alleged abuse.
 
 
 2
 This suit was filed in the Northern District of Illinois in conjunction with the plaintiffs' federal claims against the Illinois Department of Children and Family Services (DCFS). DCFS was charged with violating the Due Process Clause of the United States Constitution, violating Doe's civil rights, 42 U.S.C. Sec. 1983, and with violating the Social Security Act. 42 U.S.C. Sec. 301 et seq. The district court dismissed the federal claims against DCFS but retained supplemental jurisdiction over the remaining state common law claims against the agency and foster parents. 28 U.S.C. Sec. 1367. The parties and the court agreed that Illinois substantive law applied to the remaining claims. After a jury trial, the defendants prevailed and Doe appeals. We AFFIRM.
 
 FACTUAL BACKGROUND
 
 3
 In January, 1983, Jane Doe, a three-year old infant, was removed from her parents' custody because of her mother's severe mental problems, her father's alcoholism, and their overall neglect of the infant Doe. After a court hearing, the Illinois DCFS was granted legal custody of Doe and it assigned her case to the private agency Tag, now known as Child Serv,[1] in order that Tag could place Doe in a foster home. Betty Vining, a Tag case worker, accepted the referral on behalf of the agency and after she met with the infant Doe, called a potential foster mother, Robin Swaziek, to discuss placing Doe in her home. The Swazieks had been previously licensed as foster parents and had undergone a background investigation including a home inspection, a reference check, an employment verification, interviews and a criminal investigation. Vining personally supervised the Swazieks' foster parent training and believed that the Swazieks were qualified foster parents and would be able to give Doe the attention she needed for they had only one child, who was older than Doe, and no other foster children.
 
 
 4
 Shortly after Doe began living with the Swazieks, she underwent a complete physical examination in which the doctor detected no abnormalities in her health. At the same time, it was reported that Doe displayed difficulty interacting with her foster father, David Swaziek, and acted extremely fearful of her natural father[2] during supervised visits with her biological parents and the foster care worker. Vining reported Doe's inability to relate to her biological and foster fathers to the DCFS and recommended that Doe be evaluated by a specialist. In June of 1983, Dr. Jean Pierre Bourginon, a psychologist and the administrator of Consultants in Developmental Behavioral Disfunction, a service used by the DCFS to evaluate the needs of children in its custody, met with and evaluated Doe. Dr. Bourginon told Vining that he felt that Doe's inability to interact with her foster father and her fear of her biological father would be resolved over time, once Doe was able to spend time in a healthy and loving family environment. Vining believed that Doe's behavioral problems could be traced to the physical and emotional abuse she had received from her biological father. She also noted that, as Dr. Bourginon had predicted, there was improvement in the interaction between Doe and David Swaziek over time.
 
 
 5
 In July, 1983, another Tag case worker, Susan Clement, took over supervision of Doe's case. In 1984, after Doe's annual physical, the Swazieks told Clement that Doe's examination revealed that she was small for her age. Clement made arrangements for Doe to see a pediatric endocrinologist, Dr. Ira Rosenthal. After more than a year of observation and testing, beginning in May, 1984 and continuing through July, 1985, Dr. Rosenthal determined that Doe's lack of proper growth was probably caused from maternal deprivation syndrome, a condition in which the child is deprived of maternal nurturing by his or her biological mother. Dr. Rosenthal based his medical opinion on his observations during the visits he had with Doe as well as the numerous tests he performed to rule out other medical problems that might be contributing to Doe's short stature.
 
 
 6
 In April, 1985, after a court hearing, Doe's biological parents' rights were terminated and she was freed for adoption. Dr. Bourginon evaluated Doe again, this time to determine if the Swazieks would be suitable parents for Doe and be able to provide a stable home for her. Although he determined that the Swazieks and Doe should begin family therapy, in order that Doe might continue to improve her relationship with her foster father, he felt that it would be appropriate for the Swazieks to adopt Doe. After several therapy sessions, Mary Karczewski, a family therapist, determined that the best home for Doe would be one in which she was either the only child or the youngest child. Because the Swazieks wanted to have more children of their own, they decided against adopting Doe.
 
 
 7
 In June, 1986, Clement met with another couple, Michael and Gayle Stosek, and advised them that Doe was a possible candidate for adoption. Clement also advised the Stoseks that Doe was small for her age, somewhat disruptive, did not have much of an appetite, and was having difficulty getting along with her foster father. Eight days later, when Doe moved into the Stoseks' home, she was six years of age, and according to the Stoseks, weighed only 30 pounds and looked like she was only two or three years of age. Within Doe's first three months with the Stoseks, she began to develop rapidly and gained twenty pounds.
 
 
 8
 Shortly thereafter, while living with the Stoseks, Doe began making allegations of physical, sexual, and satanic ritual abuse against the Swazieks. She also exhibited behavioral problems that included throwing temper tantrums, lying if she was caught misbehaving, massaging her breasts, attempting to touch her adopted brothers between their legs, touching herself between her legs, threatening to kill the Stoseks if she saw a certain type of knife, and claiming that she had three personalities. The Stoseks arranged for Doe to see Linda Alford, a psychotherapist,[3] who continued to treat Doe for a period in excess of five-years. Alford originally began seeing Doe to help her make a smooth transition to her adoptive home, but once Alford observed that there was a "tremendous amount of violence in [Doe's] play therapy," she felt that it was necessary to increase the therapy sessions to twice a week to help Doe overcome the abuse Alford was sure she suffered. Michael Stosek testified that after Doe completed therapy, her behavior improved and she ceased her outward manifestations of unusual sexual behavior.
 
 
 9
 The Stoseks and Doe brought suit against TAG, Clement, and the Swazieks in District Court, for intentional infliction of emotional distress, to recover the expenses incurred as a result of the psychological treatment that Doe received as a result of the alleged abuse by the Swazieks, and for Tag's negligence in placing Doe with the Swazieks. During the jury trial, the plaintiffs introduced the testimony of Dr. Kraut, a pediatric gastroenterologist, who treated James C., another foster child who resided with the Swazieks during the same period as Doe. Dr. Kraut testified that in February, 1984, he examined James C. when he was admitted to Lutheran General Hospital and concluded that his height and weight were in the lower fifth percentile as compared with other children of his age. Dr. Kraut further concluded that the cause of the deficiencies in James C.'s stature and weight was that he was receiving an insufficient amount of calories in his diet at home.[4]
 
 
 10
 Prior to trial, the defendants filed a motion in limine seeking to preclude this testimony, arguing that it had no probative value because James C. had a history of abuse and neglect at the hands of his biological parents, suffered from Attention Deficit Hyperactivity Disorder (ADHD), and lived in five other foster homes that predated his placement with the Swazieks. In light of all these factors, the court agreed that the evidence had limited probative value, might be unduly prejudicial, and ruled that Dr. Kraut's testimony about James C. would be admitted solely for the purpose of evaluating Doe's credibility with respect to her allegations against the Swazieks. As a result, although Dr. Kraut was allowed to testify about his diagnosis concerning James C. on direct examination, during re-direct examination, the court barred any testimony from Dr. Kraut concerning James' progress after he moved out of the Swaziek home. Furthermore, the judge reminded the jury that Dr. Kraut was the plaintiffs' expert witness and that his testimony was being heard for the sole purpose of evaluating Doe's credibility.
 
 
 11
 The plaintiffs proffered the expert testimony of Dr. Elva Poznanski, a child psychiatrist, who testified that she met with Doe during February and March of 1989, at the request of Dr. Bennett Braun, the head of the dissociative disorders unit at Rush-Presbyterian Hospital.[5] Dr. Poznanski was asked to perform a "clinical consultation," and in response thereto, she reviewed Doe's medical records, met with Doe three or four times, as well as with Doe's treating therapists. Dr. Poznanski stated that based on her observations, she was reasonably certain that Doe suffered from a multiple personality disorder and that this disorder was caused by "severe abuse and likely ritualistic or sadistic abuse." The plaintiffs wanted to introduce testimony about Doe's future medical needs but Dr. Poznanski was not permitted to testify about her opinions on this matter because the substance of her testimony was formed after she was deposed and it was not disclosed to the defendants prior to trial, as was required by the district judge's ongoing discovery order.
 
 
 12
 Professor Eloise Cornelius, an Associate Professor Emeritus at the University of Illinois, Chicago,[6] was retained as an expert for this litigation and asked to render an opinion as to whether the agency Tag met the accepted professional standard of care for a foster care agency in Illinois in its supervision and placement of Doe. The defendants, over the plaintiffs' objections, were permitted to introduce the licensing standards and regulations of the DCFS and the Child Welfare League of America (CWLA) in evidence to aid the jury in its determination of what standards of professional responsibility Tag and Clement were required to meet. Professor Cornelius testified that Tag was required to comply with the Illinois DCFS standards, and that although the CWLA standards were voluntary, they are national in scope and followed by the majority of agencies similar to Tag. She reviewed Tag's records of Doe's placement and concluded that its services, and those of Ms. Clement, all complied with the DCFS standards as well as those of the CWLA.
 
 
 13
 The court also received testimony from Dr. Corwin, an expert witness for the defense,[7] retained for this litigation. He reviewed the records and depositions in this case, Mrs. Stosek's diary, and also interviewed Doe, the Swazieks and the Stoseks.
 
 
 14
 Dr. Corwin testified that when Doe made allegations of abuse, the Stoseks rewarded her with favorable treatment, yet if she later denied these allegations, she was not treated as favorably. Dr. Corwin also noted that Mrs. Stosek was reading extensive material about child abuse, satanic and ritual abuse, and multiple personality disorders during the time in which Doe was making these allegations, and that in his opinion, Doe was "unintentionally led" to make false allegations against the Swazieks and that these allegations were the product of parental suggestion. Lastly, Dr. Corwin stated that because of the record of instability in Doe's life and placements, he was of the opinion that she was concocting the allegations of abuse as part of an attempt to ensure that she could remain with her current family.
 
 
 15
 Doe contests two of the court's jury instructions. The first is the "missing witness/evidence"[8] instruction which was given because Doe failed to call Dr. Bennett Braun, one of her consulting psychiatrists, and one of the experts she designated to call during the trial. Although she failed to call Dr. Braun to testify, at numerous occasions during the trial, Doe's attorney stated that in Dr. Braun's opinion, Doe had been abused by the Swazieks. Doe also contests the propriety of the "missing evidence" instruction the court gave the jury because she failed to produce certain tape recorded conversations that Alford, the psychotherapist, relied on in coming to the conclusion that she was abused.
 
 
 16
 Additionally, Doe contests the short form proximate cause instruction given by the court,[9] and claims that the court's use of the short form was error and that the long form instruction was the more appropriate form to be used when instructing the jury.[10]
 
 
 17
 After the testimony was closed and subsequent to final arguments and the jury charge, Doe's attorney moved to submit numerous drawings made by Doe while she was in therapy. Doe's drawings were given to Dr. Poznanski, by the Stoseks, to aid in her diagnosis of Doe. Dr. Poznanski referred to these drawings frequently while she was testifying, and stated that:
 
 
 18
 most of [Doe's] drawings were disorganized for a child of her age.... There's not a nice neat order of here's a house, here's a tree, here is people, here is flowers. They tended to be a lot of heavy lines, the use of space was more jumbled. There were satanic cult figures embedded in many of the drawings.... Some of them had a slightly bizarre quality to them.... She made some, like, stick figures, but then would have a gun in the hand. And making a stick figure is not particularly unusual in a child, but, usually, when kids make stick figures, they don't attach on extra things.... I asked her to draw a picture of her family, which I often ask kids to do.... So [Doe] made a drawing of her mother and father and two brothers. And I asked [Doe] where she was. And her response was that she was in the room, so she didn't have to put herself in the drawing.... A child of that age doesn't usually feel that because they're sitting in the room they don't have to draw themselves in the family on paper. There was a problem in self-identity that is kind of unusual.
 
 
 19
 Dr. Poznanski testified that the contents of the drawings confirmed her belief that Doe was abused by her foster parents. For reasons unexplained in the record, the drawings were not timely offered in evidence during or immediately after Dr. Poznanski's testimony. Doe's attorney did state to the court that he was reserving the right to offer the drawings at a later time, but the attorney failed to move for the introduction of these exhibits until the testimony was closed, after respective counsel had completed their closing arguments, and the jury had been instructed. The defendants' objected to the admission of the drawings and the judge refused to re-open the testimony to allow the admission of these drawings holding that the motion was untimely and "any probative value that this evidence may have would be outweighed by jury confusion." The judge had previously expressed concern that the drawings were "exhibits that a professional would have to interpret" because "there is certainly nothing on the face" of the drawings that the jurors would find helpful in reaching a verdict.
 
 
 20
 The jury returned a verdict in favor of the defendants and the plaintiffs filed a motion for a new trial based on: the court's limiting of Dr. Kraut's testimony; the failure to give the long-form proximate cause instruction, the reading of the "missing witness/evidence" instruction; the admission of the DCFS and CWLA standards; the refusal to admit Doe's drawings; the admission of Dr. Corwin's testimony; the refusal to allow Dr. Poznanski to discuss Doe's future medical needs; and the allegedly improper and prejudicial remarks the defendants' attorney made in his closing argument about Dr. Braun and the inferences the jury could draw from his absence, the significance of the DCFS and CWLA standards and regulations, and the burden of proof in this case. The district court denied the plaintiffs' motion for a new trial, based on the issues raised in this appeal, and ruled that the verdict was not against the manifest weight of the evidence and that the plaintiffs' contentions were without merit. The plaintiffs filed a timely notice of appeal.
 
 ISSUES
 
 21
 On appeal, Doe presents the following issues for review: (1) whether the trial court abused its discretion when it limited the re-direct examination of Dr. Kraut; (2) whether the court properly instructed the jury on the issue of proximate cause; (3) whether the court erred in giving the jury "missing witness" and "missing evidence" instructions; (4) whether the court abused its discretion when:
 
 
 22
 (a) it admitted the Illinois DCFS and CWLA standards for licensing and registering foster care placement agencies; (b) it refused to allow Doe to re-open her case, after the close of testimony, closing arguments and after the jury had received its instructions, to introduce drawings; (c) it allowed Dr. Corwin to testify, over objection by the plaintiffs' attorney, about the nature of Doe's allegations; (d) it refused to allow Dr. Poznanski to testify about Doe's future medical needs, over objection; and(5) whether the court erred in refusing to grant a new trial relating to issues one through four, delineated above, and in light of the statements made by defense counsel during his closing argument.
 
 DISCUSSION
 
 23
 "We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard." Walton v. Jennings Community Hosp., Inc., 999 F.2d 277, 282 (7th Cir.1993) (citations omitted). "[U]nder this standard, a reviewing court gives special deference to the rulings of the trial court." Wheeler v. Sims, 951 F.2d 796, 802 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 320, 121 L.Ed.2d 241 (1992) (citation omitted).
 
 
 24
 Under the "abuse of discretion" standard "the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place ... [but] rather, the abuse of discretion standard is met only when the trial judge's "decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the supposed facts found are clearly erroneous."
 
 
 25
 Id. (citations omitted).
 
 
 26
 We review jury instructions as a whole, "to determine whether the jury was misled in any way and whether the jury had a proper understanding of its duties. Instructions which are accurate statements of the law and which are supported by the record will not be disturbed on appeal." United States v. Edwards, 36 F.3d 639, 645 (7th Cir.1994) (citations omitted). "We must construe the instructions in their entirety, not in isolation, and look for overall fairness and accuracy." United States v. Dack, 987 F.2d 1282, 1285 (7th Cir.1993) (citations omitted).
 
 
 27
 We will not reverse the district court's decision to deny a motion for a new trial "unless there has been an error as a matter of law or a clear and manifest abuse of discretion." United States v. Ferguson, 35 F.3d 327, 331 (7th Cir.1994) (citation omitted).
 
 A.
 
 28
 While Doe does not contest the district court's ruling that Dr. Kraut's testimony could only be used to assess Doe's credibility, she asserts that Tag "opened the door"[11] for the reception of the evidence concerning the possible causes of James C.'s malnutrition during cross examination[12] and that she should have been allowed to question Dr. Kraut about James C.'s malnutrition during re-direct examination.[13] Tag responds that Doe failed to cite any authority in support of her argument that Dr. Kraut should have been allowed to testify more fully on re-direct, and thus, it must fail. In the alternative, Tag asserts that Doe's re-direct examination violated the judge's in limine order restricting the scope of Dr. Kraut's testimony because his testimony did not relate to Doe's credibility, and furthermore, it did not open the door to such testimony during cross-examination.
 
 
 29
 Doe's claim that Dr. Kraut should have been allowed to testify about James C.'s medication after his release from the hospital must fail because she failed to comply with Federal Rule of Appellate Procedure 28(a)(5) which requires citation to authorities in support of arguments on appeal.[14] We have made it clear that "a 'litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point.' " Littlefield v. McGuffey, 954 F.2d 1337, 1342 (7th Cir.1992) (quotation omitted).
 
 
 30
 We also disagree with Doe's argument for we are of the opinion that the district court did not abuse its discretion when it sustained Tag's objection to the question posed on re-direct examination. When Doe's attorney asked Dr. Kraut whether James continued to grow and gain weight after he left the Swazieks' home, Tag made a general objection which the court sustained. Doe's attorney abandoned his objection to the limiting of Dr. Kraut's testimony by not pursuing it or requesting of the presiding judge that she make a specific ruling as to why it was sustained; thus it was not properly preserved for our review. "It will be assumed [in the case of a general objection which is sustained], in the absence of any request by the opposing party or the court to make the objection definite, that it was understood, and [if any ground exists for the exclusion] that the ruling was placed on the right ground." Hutter Northern Trust v. Door County Chamber of Commerce, 467 F.2d 1075, 1079 (7th Cir.1972) (quoting McCormick Evidence, Sec. 52 (2d ed. 1972)) (alteration in original); cf. United States v. Kladouris, 964 F.2d 658, 665 (7th Cir.1992) (general objections to the reception of evidence do not preserve an issue for appellate review because they do not alert the court or opposing party as to the specific grounds for the objection).
 
 
 31
 Furthermore, any favorable testimony from Dr. Kraut would have been repetitious because the information Doe states that she wanted to elicit had been previously admitted in evidence. During cross-examination, Dr. Kraut made it clear that, in his opinion, James C.'s malnutrition was the result of not receiving a balanced diet, that is not ingesting a sufficient caloric intake while he was living with the Swazieks. Additionally, on re-direct examination, Doe's attorney was given ample opportunity to question Dr. Kraut about his diagnosis of James C.'s condition. Plaintiffs' counsel asked Dr. Kraut to explain his finding that James C. suffered from "caloric deprivation," and asked him about the tests he performed on James C. which ruled out other potential medical conditions that could have caused James C.'s weight problem. Dr. Kraut also testified, without objection, that James C. remained on Ritalin[15] after discharge from the hospital. It was only when Doe's attorney continued questioning about Ritalin that the court sustained an objection to the questions being asked of Dr. Kraut. From our review, we conclude that even if Tag "opened any doors" to further questioning during cross-examination, Doe was provided ample opportunity to explore the causes of James C.'s malnutrition during re-direct, including the fact that James C. remained on Ritalin after he left the hospital, yet continued to gain weight while living with another foster family, thereby demonstrating that it was his lack of nourishment while residing with the Swazieks, not Ritalin, that was in all probability the primary cause of his malnutrition.
 
 
 32
 Even were we to hold that the district court improperly limited Dr. Kraut's re-direct testimony, any potential error was harmless. At the end of Dr. Kraut's examination, the judge explicitly reminded the jury that his testimony "may not be considered as to the defendants Tag, now known as Childserv, or Susan Clement. That evidence may be considered in your evaluation of the credibility of [Doe], the child who testified yesterday." "Jurors are presumed to follow limiting instructions," Crossley v. General Motors Corp., 33 F.3d 818, 822 (7th Cir.1994), and this presumption is only overcome if there is an "overwhelming probability" that the jury was unable to follow the instruction as given. United States v. Beverly, 913 F.2d 337, 354 (7th Cir.1990), aff'd. sub nom. Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Doe has failed to point us to anything in the record, much less advance any persuasive argument, to convince us that the jurors did not follow the judge's directions or that they considered Dr. Kraut's testimony for any reason other than to evaluate her credibility. Furthermore, the judge's instructions were clear and understandable and there is not an overwhelming probability that the jurors were unable to follow them.
 
 
 33
 Trial judges have "wide discretion in managing cross-examination and ruling on the admissibility of evidence." United States v. Dillard, 43 F.3d 299, 305 (7th Cir.1994) (citation omitted). The effect of this discretion is that management of examination is largely confined to the trial level and removed "from the area of profitable appellate review." Mercado v. Ahmed, 974 F.2d 863, 872-73 (7th Cir.1992). The judge properly limited the scope of Dr. Kraut's testimony and instructed the jurors as to the permissible uses of his testimony. We are in agreement with the trial judge's ruling and hold that the court did not abuse its discretion when it refused to allow Doe's attorney to continue questioning Dr. Kraut further about the causes of James C.'s malnutrition on re-direct examination.
 
 B.
 
 34
 Doe's next contention is that the court erred when it read the jury the short form instruction on proximate cause, rather than the long form instruction proposed by her attorney. Doe argues that the short form instruction is appropriate only in cases where there is one tortfeasor, and that because there were numerous tortfeasors in this case, the short form instruction was improper. Tag responds that Doe waived this argument on appeal by failing to provide authority in support of her argument, and that in the alternative, the short form instruction properly alerted the jury as to the possibility of more than one cause of Doe's injuries.
 
 
 35
 We begin our discussion noting that, contrary to the defendants' assertion, Doe has cited relevant authority for her argument about this jury instruction; therefore, it is appropriate for us to consider its merits. Reversal based on a faulty jury instruction is "mandated only if the jury's comprehension of the issues is so misguided that it prejudiced the complaining party." Dack, 987 F.2d at 1284 (citations omitted).
 
 
 36
 Although Doe does provide authority for her argument in her brief, she failed to make a proper, much less a timely objection to the proposed instruction during the jury instruction conference. It is well settled that, "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. Although Doe's attorney made a general objection to the short form instruction during the jury instruction conference, he gave no specific reasons for his objection,[16] and his failure to state specific grounds for his objection before the jury was charged precludes Doe's challenge to the instruction on appeal. See, e.g., Sims v. Mulcahy, 902 F.2d 524, 535 (7th Cir.), cert. denied, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990).
 
 
 37
 We also note that the district court did not commit error in its instructions to the jury on the issue of proximate cause. In addition to reading the short instruction, the judge specifically informed the jury that each defendant's case must be considered individually and that:
 
 
 38
 [t]he rights of the defendants Tag, incorporated, now known as Childserv, Susan Clement, and Robin and David Swaziek are separate and distinct. Each is entitled to a fair consideration of his or her or its own defense; and you will decide each defendants' case separately as if it was a separate lawsuit. Each defendants' case must be governed by the instructions applicable to that case.
 
 
 39
 More than one person may be liable for causing an injury. If you decide that a defendant was negligent and that a defendant's negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the lawsuit may have also been to blame.
 
 
 40
 This instruction is clear and unambiguous and goes right to the heart of Doe's argument on appeal, demonstrating that the jury was clearly informed that each defendant's culpability must be assessed separately. The special verdict form also required the jury to return separate findings as to each defendant's liability.
 
 
 41
 After review, and in light of the short form instruction given to the jurors, combined with the additional instructions given by the judge, and the special verdict form, we are of the opinion that the jury was not misled and was properly instructed on the issue of proximate cause. Because jurors are presumed to follow the court's instructions and the plaintiffs have provided no concrete facts, much less a plausible argument to the contrary, see, Crossley, 33 F.3d at 822, we are also of the belief that the jury understood and followed the court's instruction on proximate cause and that Doe suffered no prejudice from the short form instruction.
 
 C.
 
 42
 Doe's third argument is that it was improper to give the jury the "missing witness/evidence" instruction based on her failure to call Dr. Braun, one of her experts designated to testify at trial, and her failure to provide audio tapes of conversations with her parents that were given to one of her therapists. Doe contends that she did not call Dr. Braun because his testimony would have been cumulative since it merely corroborated Dr. Poznanski's testimony, and further explained that the tapes were not produced because Linda Alford, Doe's therapist, never returned them. The defendants counter that in a pre-trial motion, the plaintiffs were specifically granted the right to question Dr. Braun because the judge found that his testimony was not going to be cumulative. The defendants also assert that the plaintiffs' contention that the tapes were never returned is "unconvincing" because had the tapes contained evidence helpful to the plaintiffs, they would have been produced.
 
 
 43
 Our discussion of this instruction is governed by the principle that whether to use the missing witness/evidence instruction is within the sound discretion of the trial court. Taylor v. Kohli, 162 Ill.2d 91, 204 Ill.Dec. 766, 768, 642 N.E.2d 467, 469 (1994) (citation omitted). We begin by calling attention to the fact that the plaintiffs' attorney proposed the missing witness instruction during the jury instruction conference.[17] The only difference between the plaintiffs' and the defendants' instruction is that the defendants also wanted the instruction to apply to missing evidence as well as missing witnesses. This court has enunciated the clear "principle that in a civil case a litigant may not attack an instruction of which he was the proponent." Williams v. Boles, 841 F.2d 181, 184 (7th Cir.1988) (citing City of Springfield v. Kibbe, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987)).
 
 
 44
 At the jury instruction conference, Doe's attorney stated that he proposed the missing witness instruction in case the defense failed to call any rebuttal witnesses she deemed necessary, yet when the defense turned her own proposed instruction on her, she sought to have the verdict overturned. An objection of this nature is without merit, to say the least, and we hold that Doe cannot raise the propriety of the missing witness instruction when her counsel proposed the very same instruction.[18]
 
 
 45
 The plaintiffs did object to the "missing evidence" instruction as it pertained to the audio taped conversations between Doe and the Stoseks. Mrs. Stosek claims that the tapes were last in the possession of Alford and that she did not remember getting them back and in any event, through no fault of her own, she was unable to produce them in court. The defendants argue that the allegations made by Doe during these taped conversations were the result of parental suggestion by Mrs. Stosek, yet the jurors were given no opportunity to hear them at trial. The defense claimed that the factual dispute as to what happened to the tapes, and that the tapes could have shown that Doe's allegation were the product of parental suggestion, were sufficient justifications to give the missing evidence instruction.
 
 
 46
 The district court read the jury the Illinois Pattern Instruction 5.01 which contains four prerequisites before a jury can be permitted to draw an adverse inference from a party's failure to produce certain evidence at trial: (1) the evidence must be within that party's control; (2) it must not be equally available to the opposing party; (3) the party would have offered the evidence if it was favorable; (4) the party last in possession of the evidence has failed to establish any reasonable excuse for the failure to produce the evidence. Although we have not explicitly expressed our disagreement with the requirements of this instruction, we have examined this exact same instruction on two previous occasions and noted our "doubts" about the first two prongs of the missing evidence instruction. See Berry v. Deloney, 28 F.3d 604, 609 (7th Cir.1994); Niehus v. Liberio, 973 F.2d 526, 530-31 (7th Cir.1992). In Niehus, we stated that "[o]ne might have supposed that it should be enough that the party could have produced the evidence and that he surely would have done so had the evidence been favorable to him--implying that the evidence was in fact not favorable to him." 973 F.2d at 530. We went on to say that "control" may sometimes be relevant as a rejoinder to a claim that either party could have produced the evidence with due diligence, but that it "does not follow ... that control should be a necessary condition for such an instruction." Id. at 531. We relied on Niehus with approval in Berry where we stated that "[a]t a minimum, we required ... that 'there is evidence that a party would surely have introduced had it been helpful, permitting an inference that the evidence would instead have helped the opponent.' " 28 F.3d at 609.
 
 
 47
 After review, we are of the opinion that there is no reason to believe that plaintiffs would not produce the tapes except that they were detrimental to their case. During cross-examination, Mrs. Stosek stated that she gave the tapes to Alford, but did not remember Alford ever having returned the tapes. Mrs. Stosek never testified that the tapes were lost or that Alford refused to return them. During her testimony, she discussed the contents of the conversations on the tapes, yet did not produce them at trial to verify her recollection of what transpired during those conversations. The record is barren as to what actually happened to these tapes, but it is a permissible inference that if they were truly probative of Doe's alleged abuse, and if they rebutted the defendants' contention that Doe's memories of abuse were the product of parental suggestion, then the plaintiffs would have produced the tapes. Thus, in our opinion, the court did not abuse its discretion when, at the request of the defendants, it instructed the jurors that they could draw the permissible inference that the tapes would have revealed evidence unfavorable to the plaintiffs. We are convinced that the plaintiffs were not improperly prejudiced by this instruction.
 
 D.
 
 48
 Doe's next argument is that the district court abused its discretion when it admitted the Illinois DCFS and CWLA standards for licensing and registering foster care placement agencies into evidence. She claims that these standards improperly led the jury to conclude that Tag and Clement, the caseworker, exercised proper care with respect to her placement with the Swazieks. The defense maintains that the standards were properly admitted because they were given as an aid to the jury, providing them with guidelines in which to determine whether or not Tag and Clement complied with the professional standard of care for foster care placement and supervision.
 
 
 49
 Once again, we note that because Doe has failed to provide the court with any support for her argument, she forfeits this claim on appeal. Even had she cited authority for her claim, it would still fail because in Illinois, regulations, standards, and by-laws function as evidence of custom in a particular field, and are acceptable evidence of the standard of care to which an agency is held. Darling v. Charleston Community Memorial Hosp., 33 Ill.2d 326, 211 N.E.2d 253, 257 (1965), cert. denied, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966); see also Schindel v. Albany Medical Corp., 252 Ill.App.3d 389, 192 Ill.Dec. 154, 159, 625 N.E.2d 114, 119 (1 Dist.1993) (evidence of accreditation standards and regulations are admissible, either alone or to supplement expert testimony, to establish a standard of care). Additionally, when dealing with an injury incurred while performing structural work in the state of Illinois, this court has held that the state's Health and Safety Act Rules were admissible to assist the jury in determining the standard of care applicable to persons or legal entities charged with violating the Illinois Structural Work Act. Schroeder v. C.F. Braun & Co., 502 F.2d 235, 243 (7th Cir.1974).
 
 
 50
 Professor Cornelius, a defense expert witness retained for this trial, reviewed Tag's records in light of the DCFS and CWLA standards, and relied on her own knowledge, experience and expertise to come to the conclusion that Tag and Clement properly supervised Doe's placement with the Swazieks. The judge admitted the standards to aid the jury in determining the proper standard of care to which Tag and Clement should be held. We have been unable to find anything in the record in support of Doe's assertion that the judge admitted these standards as conclusive proof that Tag and Clement met their standard of care, but rather, she specifically instructed the jury that[d]uring the trial, you have heard evidence regarding foster care standards issued by the Illinois Department of Children and Family Services and the Child Welfare League. Evidence regarding these standards may be considered along with all the other evidence in resolving issues of this case and should be given whatever weight you feel this evidence deserves.
 
 
 51
 (Emphasis added). Additionally, the judge clearly stated that these standards "certainly do not mandate the jury. They are not binding on the jury to follow."
 
 
 52
 The licensing standards which Tag and Clement were obligated to follow, together with Professor Cornelius' testimony, gave the jury guidelines in which they could determine whether or not Tag and Clement exercised the proper standard of care in their placement and supervision of Doe. The jurors were free to consider all relevant evidence regarding Tag's and Clement's actions in placing and supervising Doe while in a foster care home. As a result, the admission of the DCFS and CWLA standards was not an abuse of discretion.
 
 E.
 
 53
 Doe's next assignment of error involves some drawings she made which Dr. Poznanski relied upon in reaching the conclusion that Doe was both physically as well as sexually abused. When Dr. Poznanski testified, she repeatedly referred to these drawings, and stated that both the figures drawn, and the manner in which they were drawn and arranged, indicated that it was likely that Doe was abused by her foster parents. At the close of Doe's case, her attorney reserved the right to offer the drawings in evidence, but he failed to timely move the court to have the drawings admitted until after testimony was closed, closing arguments were made and the jury was instructed. The defense objected to the untimely admission of the drawings at this point in the proceedings and the court refused the plaintiffs' tardy tender of the drawings stating that the motion was untimely and that the drawings were likely to confuse the jurors. The plaintiffs claim that these drawings were relevant evidence that should have been given to the jury.
 
 
 54
 "[T]he district court has wide discretion in deciding whether to allow a party to reopen proofs after the close of evidence," and we will only review its decision for an abuse of discretion. Kafka v. Truck Ins. Exchange, 19 F.3d 383, 389 (7th Cir.1994). The timing of Doe's motion to admit the drawings into evidence was improper and should have been made while Dr. Poznanski was testifying about the drawings. Concerning the untimeliness, Doe has provided no sound argument as to why the court's refusal to give the drawings to the jury was an abuse of discretion.
 
 
 55
 Dr. Poznanski testified, both on direct and cross examination, and without objection, about the substance of the drawings and the conclusions she drew from them. Thus, the contents and her interpretation of the drawings were in evidence and it was unnecessary to give the actual drawings to the jury. We agree with the trial judge that it is quite probable that the drawings would have needlessly confused the jurors,[19] who are neither trained nor experienced in the psychological interpretation of drawings. In light of the untimely proffer of the drawings into evidence, the fact that their substance was fully in evidence, and the likelihood that they would have confused the jurors, we hold that the district court's refusal to give the physical drawings to the jury did not amount to an abuse of discretion.
 
 
 56
 The plaintiffs have failed to specify any grounds, much less case law, in support of their argument that the court committed error in refusing to admit the drawings; we thus hold that the district court's refusal to allow Doe to re-open her case for the admission of the drawings, after closing arguments were completed and the jury was instructed, was not an abuse of discretion.F.
 
 
 57
 Doe also argues that Dr. Corwin was allowed to testify about Doe's credibility and that such testimony invaded the province of the jurors, who are the sole arbiters of credibility. Tag counters that Dr. Corwin testified that after reviewing Mrs. Stosek's diaries and Doe's medical records, he was of the opinion that Doe made allegations of abuse when she was about to be punished by her parents, that if she recanted her allegations, she was treated unfavorably by the Stoseks, and that he believed that Doe's allegations were the product of parental suggestion. Furthermore, Tag contends that Doe has waived this argument on appeal because she failed to make a timely objection to this aspect of Dr. Corwin's testimony at trial.
 
 
 58
 The defendants are correct that Doe did not object to the substance of Dr. Corwin's testimony during the trial. Therefore, she has waived this issue for appellate review. Fed.R.Evid. 103(a). Even if the issue was properly preserved, Doe's claim would still fail because the testimony given by Dr. Corwin did not interfere with the jury's responsibility to judge the credibility of Doe or any witness at trial, and the district judge specifically instructed the jury that Dr. Corwin's testimony was only one of the factors to be considered in their assessment of Doe's credibility.
 
 
 59
 Dr. Corwin testified that much of the abuse Doe was able to recall probably was received at the hands of her biological parents, not the Swazieks. He also noted that when Doe told the Stoseks she was abused by the Swazieks, she was rewarded with favorable treatment, and knew that were she to recant these allegations, she would be subjected to punishment. He further pointed out that Mrs. Stosek was conducting extensive research into child and satanic ritual abuse during the particular time frame in which Doe was making these allegations.
 
 
 60
 Dr. Corwin never offered an opinion as to the credibility of either Doe or Mrs. Stosek, but rather, merely discussed the possibility that Doe's allegations were influenced by Mrs. Stosek's contemporaneous research into child abuse. Doe's own expert witness, Dr. Poznanski, testified during her cross-examination that this type of suggestion was possible. We hold that the court's ruling that allowed Dr. Corwin to express an opinion regarding his evaluation of Doe's medical records, Mrs. Stosek's diary, and his own interview with Doe did not invade the province of the jury as arbiters of credibility, especially in light of all the facts and circumstances presented to the jury as well as the fact that defense counsel had a thorough opportunity to cross-examine Dr. Corwin and the court's jury instructions as to the limited application of such testimony. All that Dr. Corwin's testimony provided to the jury was more information concerning the facts and circumstances in this case to aid them in weighing Doe's credibility.
 
 
 61
 We agree with the district judge that at no point were the juror's functions as arbiter of credibility invaded for the district court carefully instructed them and made clear that they were "the sole judges of the credibility of the witnesses and the weight to be given to the testimony of each of them." During Dr. Corwin's testimony, the judge specifically told the jury that
 
 
 62
 this is not testimony as to the truthfulness or accuracy of this information. The witness is explaining what he relied on in forming his opinions. To what extent the jury decides to accept or reject that analysis and what weight to give this witness' testimony, is up to you, ladies and gentlemen, and nobody else.
 
 
 63
 The court properly limited the scope of Dr. Corwin's testimony, and the jurors were free to give his testimony whatever weight they deemed proper. From our review of Dr. Corwin's testimony, we are in agreement with the trial court's ruling that the evidence did not invade the province of the jury as to the question of credibility and merely dealt with his opinion that Doe's allegations probably were fabricated and were the product of parental and therapeutic suggestion.
 
 G.
 
 64
 Doe's next contention is that the district court's refusal to allow her to question Dr. Poznanski about Doe's future medical needs was an abuse of discretion. Dr. Poznanski was deposed about her consultations with Doe prior to the close of discovery.[20] The court's discovery schedule had expired when Dr. Poznanski resumed seeing Doe and made further assessments as to her continuing medical needs. The court's discovery order mandated that the defendants were entitled to know the substance of each witness' testimony before trial began, yet the plaintiffs failed to provide the defense with the substance of Dr. Poznanski's opinions formed after her deposition. As a result, the judge only allowed testimony concerning Dr. Poznanski's opinion about the information and matters revealed during the time frame for discovery that was set by the court. Doe claims that this ruling amounted to an abuse of discretion because the defendants could have questioned Dr. Poznanski about Doe's future medical needs at the deposition, but that they failed to do so.
 
 
 65
 "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1). "We review the district court's decision to impose Rule 37 sanctions for abuse of discretion. Indeed, because the district court is in the best position to determine whether a party has complied with discovery orders, its discretion 'is especially broad.' " Shine v. Owens-Illinois, 979 F.2d 93, 96 (7th Cir.1992) (citations omitted).
 
 
 66
 Doe attempted to admit testimony about expert opinions that were formed after the close of the court's discovery schedule, yet she failed to provide the defendants with a summary of the substance of the expert's testimony. As such, the court acted well within its discretion when it refused to admit testimony about Dr. Poznanski's post-deposition findings. While Doe asserts that the defendants' could have obtained these opinions during the deposition, Dr. Poznanski refused to offer any opinion about Doe's need for continuing treatment at the deposition.[21] Thus, Dr. Poznanski foreclosed the possibility of opinions regarding further treatment, and contrary to Doe's assertion, the defense cannot be considered negligent because it did not pursue such opinions.
 
 
 67
 Furthermore, Dr. Poznanski's opinions were relevant only to the issue of damages, an issue that the jury never was called upon to consider for it returned a verdict in favor of the defendants. "[P]resentation of evidence regarding the scope and effect of ... injuries assists the jury only in determining damages.... As a matter of law, such testimony cannot be presumed to have any material effect on the jury's ruling on liability." Mraovic v. Elgin, Joliet & Eastern Ry. Co., 897 F.2d 268, 271 (7th Cir.1990) (citation omitted). Because the judge properly limited the substance of Dr. Poznanski's testimony to that which was disclosed to the defendants in a timely manner, and because the jury never even reached the issue of damages, Doe's claim of abuse of discretion is without merit.
 
 H.
 
 68
 The final issue on appeal is whether the defendants' attorney made improper and prejudicial remarks during his closing argument such that a new trial should have been granted. Doe lists a number of remarks as the basis for this contention including the fact that defense counsel referred to the "missing" witness and evidence, stated that adverse inferences could be drawn from their absence, referred to the DCFS and CWLA standards and regulations as evidence that Tag did not breach its duty of care, and finally, that the defense attorney stated that Doe's attorney, rather than Doe, bore the burden of proof in this case. The defendants counter that the remarks were proper, based on the instructions given the jury, and that Doe's failure to object to the remarks during the closing argument, amounts to a waiver of this issue on appeal.
 
 
 69
 It is true that "neither trial tactics nor mere temerity will excuse counsel's failure to object to a remark made in closing argument." Carmel v. Clapp & Eisenberg, P.C., 960 F.2d 698, 704 (7th Cir.1992) (citations omitted). At trial, Doe's counsel made no objections to the defendants' closing argument, yet now tries to raise its impropriety on appeal. Any potentially improper statements should have been called to the attention of the trial judge, in order that she might be given a timely opportunity to correct any prejudice that might result from such remarks. The plaintiffs' failure to do so, waives this issue on appeal.
 
 
 70
 Furthermore, "[t]his court has repeatedly explained that 'improper comments during closing argument rarely rise to the level of reversible error.' " Valbert v. Pass, 866 F.2d 237, 241 (7th Cir.1989) (citation omitted). The plaintiff has a heavy burden when she seeks a new trial based on improper remarks during a closing argument and from our review of the record, we are of the opinion that Doe has not even come close to meeting her burden. We disagree with Doe's argument for the bulk of the comments she alleges were improper were clearly based on the testimony received as well as the jury instructions given. As explained above, those instructions were proper. Thus the defendants' reference to the "missing" witness and evidence does not constitute error, especially in light of the fact that Doe's attorney proposed a missing witness instruction. Furthermore, admission of the CWLA and DCFS standards was wholly appropriate as was defense counsel's reliance on them during closing. Finally, the judge properly instructed the jury that the plaintiffs bore the burden of proof in this case; therefore, Doe's contention that she was prejudiced when the defense attorney told the jury that the plaintiffs' attorney bore the burden of proof is without merit. The district court was well within its discretion to deny the motion for a new trial because the defense attorney's remarks in closing argument were proper.
 
 
 71
 AFFIRMED.
 
 
 
 *
 Honorable Thomas M. Reavley, Judge of the United States Court of Appeals for the Fifth Circuit is sitting by designation
 
 
 [1]
 Tag was a licensed, not-for-profit, social service agency that provided foster care services pursuant to contracts with the DCFS. Once a child was accepted for foster placement, Tag foster care workers supervised the placement of that child to ensure that his or her physical, social and emotional needs were being met. The workers made periodic visits to the foster home, arranged doctor visits, met with the child's teachers, and maintained contact between the child and her natural parents whenever possible. Tag workers also made written reports to DCFS and attended case review meetings with DCFS workers to advise them of the child's status and placement
 
 
 [2]
 Doe claimed that her biological father physically abused her
 
 
 [3]
 Alford holds a Master of Science in counseling
 
 
 [4]
 Based on these findings, an abuse and neglect report concerning James C. was filed against the Swazieks, but, after investigation, the report was determined to be unfounded and was expunged from DCFS's records
 
 
 [5]
 At trial, Dr. Poznanski testified that she was consulted for the "purpose of seeing if DCFS would up their funding of [Doe's] therapy, and also to provide some supervision for [Alford]." She was not hired to be a long-term treating physician, nor was she consulted solely in preparation for litigation
 
 
 [6]
 Professor Cornelius, who has an A.B.D. in Educational Administration, and an M.A. in Social Service Administration, enjoyed a twenty-eight year tenure with the University of Illinois, during which time she taught graduate level classes such as child and adolescence psychopathology and children and families
 
 
 [7]
 Dr. Corwin is an assistant professor of psychiatry at Washington University Medical School in St. Louis, Missouri, and serves as the director of the Washington University Center for Child and Family Development
 
 
 [8]
 The Illinois Missing Witness/Evidence Pattern Instruction (5.01), reads:
 If a party to this case has failed to offer evidence or produce a witness within the party's power to produce you may infer that the evidence or testimony of the witness would be adverse to the party if you believe each of the following elements:
 
 
 [1]
 The evidence or witness was under the control of the party and could have been produced by the exercise of reasonable diligence;
 
 
 [2]
 The evidence or witness was not equally available to an adverse party;
 
 
 [3]
 A reasonably prudent person under the same or similar circumstances would have offered the evidence or produced the witness if that party believed it to be favorable to the party's case;
 
 
 [4]
 No reasonable excuse for the failure has been shown
 
 
 [9]
 The short form of the Illinois Proximate Cause Pattern Instruction 15.01 reads:
 When I use the expression 'proximate cause,' I mean that cause which, in natural or probable sequence, produced the injury complained of.
 
 
 [10]
 The plaintiff's tendered proximate cause instruction, also based on Illinois Pattern Instruction 15.01, reads:
 When I use the expression 'proximate cause,' I mean that any cause which, in a natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.
 
 
 [11]
 Although Doe agrees that questioning about James C.'s condition after he left the Swazieks' home violated the judge's in limine order, she asserts that because Tag questioned Dr. Corwin about it on cross-examination, it became a proper subject for re-direct examination
 
 
 [12]
 The following exchange took place during cross-examination:
 TAG: Doctor, now, I think I understand your testimony to mean that the weight and the height that you observed during the in-patient hospitalization was consistent with history of a child being on Ritalin with an attention deficit disorder--could have been attributed to a child on Ritalin because of attention deficit disorder, together with some psychosocial deprivations? And that you should consider other medical causes, as well.
 DR. KRAUT: The testimony was--with respect to Ritalin, the question that you asked me was, can a kid have poor appetite and difficulty gaining weight because of Ritalin; the answer is yes.
 Then you asked me my clinical impression of this child in the hospital, was his weight loss and bad appetite because of Ritalin; and I do not have--I did not have that impression. The impression was that he was not getting enough calories at home, and that in the hospital he would get enough calories and should gain weight; that was the impression.
 We felt that Ritalin was helping his hyperactivity and was not playing a major role in this case, with respect to his weight problems.
 
 
 [13]
 After Tag finished its cross-examination, Doe gave the following redirect examination:
 DOE: To the best of your knowledge, while he was hospitalized and later when discharged, did James continue on the Ritalin?
 DR. KRAUT: To the best of my knowledge.
 DOE: And even continuing on the Ritalin, he gained weight and grew?
 TAG: I object to that, your Honor.
 THE COURT: Sustained.
 DOE: Nothing further, your Honor. Thank you.
 
 
 [14]
 Federal Rule of Appellate Procedure 28(a)(5) provides, in relevant part:
 The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on.
 
 
 [15]
 Ritalin is the brand name for methylphenidate hydrochloride, a mild amphetamine based stimulant that is used to treat people with ADHD and narcolepsy. It stimulates neurotransmitters that arouse the central nervous system and these transmitters allow the person to concentrate more fully. Ritalin is a potentially psychologically addictive drug, and because patients often increase dosages on their own, the patient may build up a tolerance to it. The most common side effects of Ritalin are loss of appetite, abdominal pain, weight-loss during long term therapy, high blood pressure, insomnia and occasionally, muscular tics. See, e.g., PDR Family Guide to Prescription Drugs 546-49 (1993); Edna D. Copeland, Ph.D., Medications for Attention Disorders and Related Medical Problems 163 (1991)
 
 
 [16]
 During the instruction conference, the following exchange was the entirety of the discussion about the proximate cause instruction:
 DEFENDANTS' ATTORNEY: The next [instruction], your Honor, is Plaintiff's No. 3. And all of Defendant's Proposed Instruction No. 3.
 And this again, your Honor, is IPI 15.01, the proximate cause instruction. The difference between the two, the plaintiffs want the long form and we want the short form of the proximate cause definition.
 THE COURT: Well, All Defendants' 3 is certainly easier to understand than Plaintiff's 3.
 PLAINTIFFS' ATTORNEY: I believe all we did was recite IPI language.
 DEFENDANTS' ATTORNEY: There's no dispute on that. It's just that we think the short form of 15.01 should be given on proximate cause.
 THE COURT: I find even though it is a Pattern Instruction in the long form, it is really difficult to understand. I know, I read it to juries and they look at me blankly.
 I think that All Defendants' 3 is clear, more concise, and helpful to the jury. So I will give All Defendants' 3 and refuse Plaintiff's 3.
 
 
 [17]
 When the judge asked Doe's attorney why he was proposing a missing witness instruction, he responded, "I don't know what the further evidence would bear out, the witnesses produced by the defendant, and that's why we propose this instruction. I mean, rebuttal type witnesses and finishing their case-in-chief."
 
 
 [18]
 We will not respond to the merits of Doe's argument that the missing witness instruction was improper. We do note, however, that Doe's contention that she did not call Dr. Braun to testify because his testimony would have been cumulative, contradicts her attorney's arguments during pre-trial motions when he contended that Dr. Braun and Dr. Poznanski differed on a few issues, and that therefore, Dr. Braun's testimony would not be cumulative. In light of the contradictory arguments made with respect to Dr. Braun's testimony, and because Doe's counsel, at numerous points throughout the trial, told the jury that Dr. Braun would corroborate the allegations of abuse, Doe cannot now claim error because the court instructed the jury of the consequences of failing to call a witness who was referred to in argument as being able to substantiate her claims
 
 
 [19]
 Federal Rule of Evidence 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 [20]
 On April 20, 1993, the court ordered that all parties were to identify their testifying experts and provide summaries of their opinions by June 28, 1993. The order also required all expert discovery to be completed by July 28, 1993 and stated that no further extensions would be allowed
 
 
 [21]
 Dr. Poznanski stated that in order to assess Doe's future medical needs, she would have to meet with Doe, find out if her adoptive family was having any behavioral problems with her, and see her school records. Additionally, although Dr. Poznanski stated that she believed Doe had improved since the last time she saw her, Dr. Poznanski stated that she would not offer an opinion as to the degree of improvement without the benefit of a more current personal evaluation of Doe's condition